2006-NMCA-045

133 P.3d 842

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Anthony ROMERO, Defendant–Appellant.**

**No. 24,389.**

Court of Appeals of New Mexico.

Feb. 6, 2006.

Certiorari Granted, No. 29,690,
April 10, 2006.

Patricia A. Madrid, Attorney General, Santa Fe, NM, Joel Jacobsen, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Will O'Connell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

PICKARD, Judge.

{1} This case requires us to decide whether several statements made by a domestic violence victim were "testimonial" for purposes of Confrontation Clause analysis under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We also address whether Defendant forfeited his confrontation rights because he was convicted in a separate proceeding of having murdered the victim several months after the domestic violence incident with which this case is concerned. Finally, we address Defendant's assertion that other witness testimony was admitted in violation of Rule 11–404(B) NMRA. We hold that some of the victim's statements were testimonial in nature, that Defendant properly preserved his objections to their admission, and that the admission of the statements was not harmless error. Because we also hold that the State is required to prove the factual elements of the "forfeiture by wrongdoing" doctrine, we remand for the trial court to make the necessary factual findings.

## BACKGROUND

{2} A jury convicted Defendant of aggravated battery against a household member, aggravated assault against a household member, false imprisonment, and intimidation of a witness. He was acquitted of criminal sexual penetration. The charges arose out of an incident that occurred on October 12–13, 2001, between Defendant and his estranged wife, Jessica Romero de Herrera (the victim). On December 28, 2001, the victim was found dead in Defendant's bed. In a separate proceeding, Defendant was convicted of second-degree murder in connection with his wife's death, but this Court overturned his conviction based on an error in jury instructions. *State v. Romero*, 2005–NMCA–060, ¶¶ 22–23, 137 N.M. 456, 112 P.3d 1113, *cert. granted*, 2005–NMCERT–005, 137 N.M. 523, 113 P.3d 346.

{3} At the trial concerning the October 2001 domestic violence charges, the State relied heavily on several of the victim's statements, the admission of which Defendant contests in this appeal. First, the State relied on the victim's grand jury testimony, which set forth the following facts. Defendant and the victim were separated, and Defendant called the victim wanting to get back together and threatening suicide. Sometime during the late hours of October 12th or early hours of October 13th, the victim went looking for Defendant and when she found him, they went back to Defendant's mother's house. While the victim was lying on the bed, Defendant got on top of her and choked her, saying that "if he couldn't have [her] ... nobody could." The next thing the victim remembered was waking up the following morning, but she could not say whether she had passed out.

{4} At some point on the 13th, the victim was able to call her roommate, Lisa Chavez, and ask for help. Chavez called the police, who came to investigate. When the police arrived, Defendant forced the victim to go into the bathroom, where he held a knife to her abdomen and told her to be quiet. The police left, but eventually came back. This time, Defendant let the victim go and told her to tell everyone that the marks on her neck were a result of "rough sex." She then left the house, went to meet the police, and told them what had happened. Defendant was not apprehended at this time, as he apparently ran out the back door.

{5} Next, the State relied on the testimony of Officer Lewandowski, who responded to the incident. Lewandowski testified that the victim came out of the residence, drove her car about 15 feet toward the officers' location, and then got out and ran toward the officers. He said the victim was "crying [and] asking for help" and that she had red marks on her neck and watery eyes. Lewandowski also testified that the victim told him that Defendant "choked her, held a knife to her throat while she was in the bathroom, and ... stated that if he couldn't have her, no one could, and that he would kill her." Through Lewandowski, the State also introduced several photographs, taken by Lewandowski on the evening of October 13th, which documented the victim's injuries, including "marks" on her neck.

{6} The State also relied on two additional statements of the victim. One was a statement taken at the police station by Lewandowski at approximately 5 p.m. on October 13th. This statement essentially duplicated the grand jury testimony. The other was a statement taken by a Sexual Assault Nurse Examiner (SANE) practitioner. Although the victim had not mentioned being raped in any of her prior statements, she told Lewandowski on approximately November 1, 2001, that Defendant had raped her during the incident. As a result, Lewandowski arranged for the victim to meet with a SANE practitioner for an examination and interview on November 8, 2001. The SANE practitioner, Melinda Tucker, testified at trial and read the victim's statement to the jury. This statement essentially duplicated the grand jury testimony and the stationhouse statement, but added that Defendant had raped the victim.

{7} Finally, Chavez and the victim's mother both testified regarding telephone conversations they had with the victim during the incident. Chavez testified as to the following facts. The victim had called her, sounding "scared." The victim said that she was at Defendant's house and that she wanted to leave, but Defendant would not let her. After the conversation ended, Chavez waited almost half an hour and then called the victim back. At this point, Chavez asked the victim whether she was okay and whether Chavez should call the police. The victim stated that she was not okay and agreed that Chavez should call the police.

{8} The victim's mother testified that the victim called her on the afternoon of October 13th and said that Defendant would not let her leave. The mother said that the victim sounded scared and like she had been crying. Finally, the mother testified that the victim said Defendant was holding a knife to her throat and telling her that if she said anything, she would never see her kids again.

{9} Chavez and another of the victim's friends, Elaine Jaramillo, were also allowed to testify regarding two past incidents of domestic violence between Defendant and the victim. The trial court allowed this testimony under Rule 11–404(B), and we discuss the specifics of the testimony below where we address Defendant's Rule 11–404(B) arguments.

{10} Before trial, Defendant argued that all of the victim's statements should be excluded "on the grounds of hearsay and on the grounds that she is unavailable and not subject to cross examination." Defendant initially filed a notice to have the SANE statement admitted and eventually introduced the grand jury testimony himself. However, Defendant was clear throughout the proceedings on his position that all of the victim's statements should be excluded, but that if some were going to be admitted, he wanted to introduce others for purposes of impeachment. *See* Rule 11–806 NMRA (allowing attack on the credibility of a hearsay declar-

ant with "any evidence which would be admissible ... if declarant had testified as a witness"). Ultimately, the trial court let all of the statements in, ruling that they met various hearsay exceptions.

{11} Because the hearings and trial were held before the United States Supreme Court issued its decision in *Crawford,* the parties argued under the old *Roberts* test, which required only a showing that a statement either falls within a " 'firmly rooted hearsay exception' " or bears " 'particularized guarantees of trustworthiness.' " *Crawford,* 541 U.S. at 60, 124 S.Ct. 1354 (quoting *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)). The trial court apparently found that all of the statements were admissible under *Roberts.* On appeal, Defendant argues that admission of four of the statements (the grand jury testimony, the stationhouse statement, the statement to the SANE practitioner, and the statement to Lewandowski at the scene) violated his rights under the Confrontation Clause, as that Clause was interpreted in *Crawford.* The parties agree that *Crawford* applies in this case. We begin by addressing several preliminary matters, and we then analyze each statement under *Crawford.*

**STANDARD OF REVIEW**

{12} Defendant's claim that the victim's statements were admitted in violation of his Confrontation Clause rights presents a constitutional question that we review de novo. *State v. Lasner,* 2000–NMSC–038, ¶ 24, 129 N.M. 806, 14 P.3d 1282 (holding that Confrontation Clause claims are reviewed de novo). We review the trial court's decision to admit evidence under Rule 11–404(B) for abuse of discretion. *State v. Williams,* 117 N.M. 551, 557, 874 P.2d 12, 18 (1994), *questioned on other grounds as recognized in State v. Kerby,* 2005–NMCA–106, 138 N.M. 232, 118 P.3d 740.

**DISCUSSION**

**I. Preservation of the *Crawford* Issues**

{13} The State first argues that Defendant failed to preserve his Confrontation Clause arguments. In the alternative, the State argues that Defendant waived his right to object to certain statements by himself arguing

for their admission. We disagree with both of these contentions.

{14} The State argues that Defendant failed to preserve his Confrontation Clause claims because he did not argue that the contested statements were "testimonial," as statements must be for the *Crawford* holding to apply. In order to preserve an issue for appeal, it must "appear that [the] appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court." *Woolwine v. Furr's, Inc.,* 106 N.M. 492, 496, 745 P.2d 717, 721 (Ct.App.1987). In this case, we note the following statement by the trial court:

> THE COURT: What I'm hearing is people are talking about—you're talking about [Rule 11–804(B)(5) ], and what's being argued, which I guess is not too surprising, is confrontation clause stuff. Right? Nobody's used the term, but that's what I'm hearing.
>
> [DEFENSE ATTORNEY]: That's right, your Honor.

We also note that in his initial motion to exclude all of the victim's statements, Defendant stated as one ground for doing so that "Defendant has never had the opportunity to cross examin[e] or confront the witness regarding her statements."

{15} The State appears to argue that Defendant's trial counsel should have been able to anticipate *Crawford's* holding by piecing together statements from various concurring opinions by individual United States Supreme Court Justices. We do not believe defendants should be required to scour concurring opinions to determine the direction in which the Supreme Court may or may not be heading in the future. We also note that other jurisdictions have been fairly liberal with regard to preservation of Confrontation Clause claims that are based on *Crawford* but were litigated before the opinion came out. *See, e.g., Commonwealth v. Whitaker,* 878 A.2d 914, 921 n. 3 (Pa.Super.2005) (noting that in order to preserve a *Crawford* argument, a defendant need only "object to admissibility on Sixth Amendment Confrontation Clause grounds"); *People v. Ruiz,* No. H026609, 2005 WL 1670426, at *3 (Cal.Ct.

App. July 19, 2005) (unpublished) ("[C]ounsel expressly argued that the admission of the wife's hearsay statements violated the confrontation clause in the sense that they were not trustworthy. . . . Under the circumstances, this was more than adequate to preserve defendant's *Crawford* contention."). Given the trial court's statement and Defendant's assertions in his motion, we hold that Defendant "fairly invoked a ruling [by] the trial court" that admission of the victim's statements would violate his confrontation rights. Accordingly, we hold that Defendant's general Confrontation Clause arguments were sufficient to preserve his *Crawford* claims. *See also State v. Lopez,* 2000–NMSC–003, ¶ 11, 128 N.M. 410, 993 P.2d 727 (holding that objection on the grounds of "inability to cross examine or confront the witness" was adequate to raise Confrontation Clause claims even though the defendant did not mention the Sixth Amendment).

{16} The State next argues that Defendant waived his objections to both the grand jury testimony and the victim's statement to the SANE practitioner because he either admitted those statements himself or acquiesced in their admission. We disagree. As explained above, Defendant made clear throughout the proceedings that none of the victim's statements should be admitted, but that, if some statements were admitted, he wanted to introduce others for impeachment purposes. This does not constitute a waiver. In *State v. Martinez,* we said, "The law in this jurisdiction is that if improper evidence is admitted over objection, resort may be had to like evidence without waiving the original error." 95 N.M. 795, 802, 626 P.2d 1292, 1299 (Ct.App.1979). *See also State v. Kile,* 29 N.M. 55, 70, 218 P. 347, 351 (1923) ("[W]here incompetent evidence is admitted over objection, and where it becomes expedient or necessary to rebut the same, . . . resort may be had to the same class of objectionable evidence without waiving the original error."); 1 John W. Strong, *McCormick on Evidence* § 55, at 246–47 (5th ed. 1999) ("If a party who has objected to evidence of a certain fact himself produces evidence from his own witness of the same fact, he has waived his objection. . . . However, when his objection is made and overruled, he

is entitled to . . . explain or rebut, if he can, the evidence admitted over his protest. Consequently, there is no waiver . . . if he meets the testimony with other evidence which, under the theory of his objection, would be inadmissible." (footnotes omitted)). Thus, we hold that Defendant properly preserved, and did not waive, his objections to the admission of each of the victim's four statements.

## II. Application of the Forfeiture by Wrongdoing Doctrine

{17} We next address the State's contention that Defendant forfeited all of his Confrontation Clause objections under the doctrine of "forfeiture by wrongdoing" because he was later convicted of murdering the victim. The doctrine of forfeiture by wrongdoing was first explained by the United States Supreme Court in *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878). In *Reynolds,* the defendant was charged with bigamy and the evidence showed that he had tried to keep the whereabouts of one of his alleged wives from the police. *Id.* at 159–60. At trial, the defendant objected to the admission of the alleged wife's statement from a prior proceeding. The Court stated:

> The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away. The Constitution does not guarantee an accused person against the legitimate consequences of his own wrongful acts.

*Id.* at 158. The *Reynolds* Court based its decision on "the maxim that no one shall be permitted to take advantage of his own wrong[.]" *Id.* at 159.

{18} The forfeiture by wrongdoing doctrine has been accepted in many jurisdictions and *Crawford* specifically recognizes that it does not run afoul of the Confrontation Clause: "[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds[.]" 541 U.S. at 62, 124 S.Ct. 1354. In 1997, the doctrine was incorporated into

the Federal Rules of Evidence. Federal Rule of Evidence 804(b)(6) (FRE 804(b)(6)), which applies when the declarant is unavailable, creates a hearsay exception for "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness."

■ {19} Despite widespread acceptance of the doctrine of forfeiture by wrongdoing, however, there has been some confusion over its requirements. Specifically, and of significance to the present case, courts have disagreed over the intent requirement present in the federal rule. The federal rule was enacted to prevent defendants from gaining an advantage by intimidating witnesses. 30B Michael H. Graham, *Federal Practice and Procedure: Evidence* § 7078, at 702 (Interim ed. 2000) ("Rule 804(b)(6) is an attempt to respond to the problem of witness intimidation[.]"). As a result, the plain language of the rule requires that the defendant not only be involved in causing the witness's unavailability, but also that the defendant commit the relevant act with the *intent* to prevent the witness from testifying.

{20} Some state and federal courts, however, have decided that the "intent to silence" requirement is only mandated by the federal rules and not by the constitution. *See, e.g., United States v. Garcia–Meza*, 403 F.3d 364, 370 (6th Cir.2005) ("Though the Federal Rules of Evidence may contain [the intent to silence] requirement, the right secured by the Sixth Amendment does not[.]" (internal citation omitted)); *Gonzalez v. State*, 155 S.W.3d 603, 611 (Tex.App.2004) (holding that while some courts have adopted the intent to silence requirement, "we see no reason why the [forfeiture] doctrine should be limited to such cases"); *Ruiz*, 2005 WL 1670426, at *6 ("Ultimately, if the forfeiture rule is to further the maxim that no one shall be permitted to take advantage of his own wrong, then the motivation for the wrongdoing must be deemed irrelevant." (internal quotation marks and citation omitted)).

{21} Other courts have stated the intent to silence requirement as an element of their forfeiture by wrongdoing doctrine, but those courts have generally not analyzed the rela-

tive benefits of adopting or not adopting that element. *See, e.g., United States v. Houlihan*, 92 F.3d 1271, 1279 (1st Cir.1996) ("[A] defendant who wrongfully procures a witness's absence for the purpose of denying the government that witness's testimony waives his right under the Confrontation Clause to object to the admission of the absent witness's hearsay statements."); *Commonwealth v. Edwards*, 444 Mass. 526, 830 N.E.2d 158, 170 (2005) (holding the doctrine applicable where "the defendant acted with the intent to procure the witness's unavailability"); *State v. Wright*, 701 N.W.2d 802, 814–15 (Minn.2005) (en banc) ("In Minnesota, a defendant will be found to have forfeited by his own wrongdoing his right to confront a witness against him if the state proves that the defendant engaged in wrongful conduct, that he intended to procure the witness's unavailability, and that the wrongful conduct actually did procure the witness's unavailability.").

{22} Our Supreme Court has recognized the forfeiture by wrongdoing doctrine and has also required the State to prove the defendant's intent to silence the witness. In *State v. Alvarez–Lopez*, the defendant had absconded from the jurisdiction and remained a fugitive for seven years. 2004–NMSC–030, ¶ 5, 136 N.M. 309, 98 P.3d 699. By the time he turned himself in, one of the State's key witnesses had been deported to Mexico and could not be found. *Id.* The witness would have been available to testify had the defendant's trial been held when it was supposed to be. *Id.* ¶ 12. Thus, in a sense, the defendant's action of absconding prevented the State from putting on its witness. *See id.* The trial court allowed the State to present a statement that the witness had made to the police shortly after the incident in question. *Id.* ¶ 5. The defendant argued that the admission of the statement violated his confrontation rights, and the State responded that the defendant had forfeited his right to confrontation by absconding. *Id.* ¶ 7.

{23} The Court began its analysis by citing *Reynolds* and explaining the general contours of the forfeiture by wrongdoing doctrine. *Id.* ¶ 8. It then cited a Tenth Circuit

case, *United States v. Cherry*, 217 F.3d 811 (10th Cir.2000), which held that the Confrontation Clause and FRE 804(b)(6) are essentially coextensive and that the elements of the rule are constitutionally mandated. *Alvarez–Lopez*, 2004–NMSC–030, ¶ 9, 136 N.M. 309, 98 P.3d 699; *see Cherry*, 217 F.3d at 816 ("We ... read the plain language of Rule 804(b)(6) to permit the admission of those hearsay statements that would be admissible under the *constitutional* doctrine of waiver by misconduct[.]" (emphasis added)). Our Court noted that New Mexico has not adopted a rule of evidence that parallels FRE 804(b)(6). *Alvarez–Lopez*, 2004–NMSC–030, ¶ 9, 136 N.M. 309, 98 P.3d 699. But stating that "we are bound to apply federal law in determining the minimum level of a criminal defendant's constitutional right to confrontation," the Court then proceeded to apply the four-part test under FRE 804(b)(6). *Alvarez–Lopez*, 2004–NMSC–030, ¶¶ 9–10, 136 N.M. 309, 98 P.3d 699. The Court thus implied, but did not explicitly state, that it was bound to follow the Tenth Circuit's interpretation of the forfeiture by wrongdoing doctrine.

{24} The test the Court adopted requires the State to prove the following four elements by a preponderance of the evidence: "(1) the declarant was expected to be a witness; (2) the declarant became unavailable; (3) the defendant's misconduct caused the unavailability of the declarant; and (4) the defendant intended by his misconduct to prevent the declarant from testifying." *Id.* ¶ 10. In applying the test, the Court held that the defendant had not forfeited his confrontation rights for two reasons. *Id.* ¶¶ 12–13. First, the Court held that while the defendant's conduct may have been an "attenuated" cause of the declarant's absence, his conduct did not "procure" that absence. *Id.* ¶ 12. Second, the Court held that "the State failed to show [the d]efendant absconded with the specific intent of preventing [the declarant] from testifying." *Id.* ¶ 13.

{25} With regard to the intent requirement, the Court noted that "[t]he State need not ... show that [the d]efendant's sole motivation was to procure the declarant's absence; rather, it need only show that the defendant was motivated *in part* by a desire to silence the witness." *Id.* (internal quotation marks and citation omitted). The Court also stated that intent could be "inferred" in some cases:

> It may be sufficient to infer under certain facts that a defendant intended by his misconduct to prevent the witness from testifying. For example, we may be able to infer a criminal defendant's murder of a key prosecution witness was intended to prevent the witness from testifying at the defendant's trial.

*Id.* Lastly, the Court noted that the policy behind the forfeiture by wrongdoing doctrine is to "deter criminals from intimidating or 'taking care of' potential witnesses." *Id.* ¶ 14 (internal quotation marks and citation omitted). It determined that that policy would not be served by admitting the testimony because the defendant had not "intentionally prevented [the declarant] from being a witness against him." *Id.*

{26} In this case, Defendant and the State agree that the first three elements of the forfeiture by wrongdoing doctrine are met: the victim testified before the grand jury about the domestic violence incident and would likely have testified at trial; the victim is dead and is thus "unavailable"; and Defendant was involved in the victim's death. With regard to the intent element, the State argues that (1) a showing of intent to silence is not required and (2) even if it is, we should infer an intent to silence on the facts of this case. We reject both of these arguments.

{27} In support of its position that a showing of intent to silence is not required, the State argues that *Alvarez–Lopez* should not be applied in this case because in *Alvarez–Lopez* the witness had been deported during the period of the defendant's flight rather than murdered. Moreover, the State argues, the *Alvarez–Lopez* Court only chose to apply the test from FRE 804(b)(6) to the particular facts of that case but did not establish that test as the rule for all cases. We disagree with these contentions and hold that we are bound to apply the test set forth in *Alvarez–Lopez*.

{28} We certainly agree with the State that the rationale for requiring a showing of

the defendant's intent to silence the witness is much stronger in a case of deportation during the period when the defendant is a fugitive than it is in a case of murder. In a deportation case, the causal connection between the defendant's misconduct and the witness's unavailability will generally be quite attenuated. Indeed, the relationship might be better characterized as coincidental. *See People v. Melchor*, 362 Ill.App.3d 335, 355, 299 Ill.Dec. 8, 24, 841 N.E.2d 420, 436(2005), (stating that the "defendant's conduct was merely an act that incidentally rendered [the witness] unavailable"). In the case of murder, on the other hand, the defendant's misconduct is the direct cause of the witness's unavailability. Moreover, the defendant has likely committed misconduct that is more morally reprehensible than absconding. *See id.* at 354, 299 Ill.Dec. at 24, 841 N.E.2d at 436 ("Although defendant's flight was reprehensible and showed a complete disrespect for the court and the administration of justice, we do not find it constitutes wrongdoing sufficient to invoke the forfeiture by wrongdoing rule.").

{29} Nevertheless, we disagree with the State that *Alvarez–Lopez* can be limited to deportation cases. First, while the Court phrased its holding in terms of applying the FRE 804(b)(6) test to the particular case, it applied the rule because it felt itself "bound to apply federal law." 2004–NMSC–030, ¶ 9, 136 N.M. 309, 98 P.3d 699. In view of this, we read *Alvarez–Lopez* to hold that the intent to silence requirement applies to all cases where forfeiture by wrongdoing is argued. Second, and more importantly, the Court specifically referred to murder cases. The Court's acknowledgment that "we may be able to infer a criminal defendant's murder of a key prosecution witness was intended to prevent the witness from testifying at the defendant's trial," *id.* ¶ 13, clearly indicates that the Court considered whether the test it was adopting should be applicable in other types of cases, specifically cases involving the murder of a witness, and decided that it should. Thus, we hold that the test announced in *Alvarez–Lopez* applies to all cases in New Mexico involving forfeiture by wrongdoing.

{30} Despite our decision that we are bound by *Alvarez–Lopez*, we note that the State has presented several compelling reasons why a showing of intent to silence should not be required in cases where the defendant has killed the witness. First, the State cites to cases positing that the differing opinions over the intent requirement stem from confusion surrounding the proper terminology. It seems that the majority of courts have used the term "forfeiture." *See, e.g., Edwards*, 830 N.E.2d at 168 ("Given the overwhelming precedential and policy support for its adoption, we recognize the 'forfeiture by wrongdoing' doctrine in the Commonwealth."); *Gonzalez*, 155 S.W.3d at 609 ("[The defendant] forfeited his right of confrontation under the doctrine of forfeiture by wrongdoing."). Some courts, however, have referred to the doctrine in terms of "waiver." *See, e.g., United States v. Thompson*, 286 F.3d 950, 963 (7th Cir.2002); *State v. Meeks*, 277 Kan. 609, 88 P.3d 789, 794 (Kan.2004) ("[W]hen confrontation becomes impossible due to the actions of the very person who would assert the right, logic dictates that the right has been waived." (internal quotation marks and citation omitted)).

{31} The California Court of Appeal has explained the confusion caused by the use of these two terms as follows:

We glean that the intent-to-silence element arises from the erroneous use of a "waiver-by-misconduct" label. Because a "waiver" is an intelligent relinquishment of a known right, the intent-to-silence element was added in order to establish that the defendant was on notice that the declarant was a potential witness and therefore knowingly relinquished the right to cross-examine that witness. But the rule in question is characterized by the Supreme Court as a "forfeiture" that "extinguishes confrontation claims on essentially equitable grounds," not a waiver. As a forfeiture, there is no need to prove an intelligent relinquishment of a known right[.]

*Ruiz*, 2005 WL 1670426, at *6 (quoting *Crawford*, 541 U.S. at 62, 124 S.Ct. 1354, other internal quotation marks and citations omitted).

{32} The State also cites cases noting that *Crawford's* reference to the doctrine's "equitable" nature counsels against imposing an intent to silence requirement on constitutional grounds. As the Second Circuit has explained it,

> The Supreme Court's recent affirmation of the "essentially equitable grounds" for the rule of forfeiture strongly suggests that the rule's applicability does not hinge on the wrongdoer's motive. The Defendant, regardless of whether he intended to prevent the witness from testifying against him or not, would benefit through his own wrongdoing if such a witness's statements could not be used against him, which the rule of forfeiture, based on principles of equity, does not permit.

*Garcia–Meza,* 403 F.3d at 370–71 (quoting *Crawford,* 541 U.S. at 62, 124 S.Ct. 1354).

{33} We find both the California court's explanation of the waiver/forfeiture distinction and the Second Circuit's point regarding the equitable nature of the doctrine to be persuasive, at least in cases of the murder of the witness or the death of the witness arising out of a domestic violence situation. *See Melchor,* 362 Ill.App.3d at 344–45, 299 Ill. Dec. at 16–17, 841 N.E.2d at 438–29,. We also note that our Supreme Court may not have had the benefit of these thoughtful analyses when it decided *Alvarez–Lopez.* We take judicial notice of the briefs filed in *Alvarez–Lopez,* and we note that the State in that case agreed that intent to silence must be proved. *See Garcia v. Mora Painting & Decorating,* 112 N.M. 596, 601, 817 P.2d 1238, 1243 (Ct.App.1991) (taking judicial notice of the briefs in another case).

{34} In addition, we note that while our Court in *Alvarez–Lopez* consistently used the term "forfeiture," *Cherry,* the Tenth Circuit case relied on by our Court, consistently uses the term "waiver." *See Cherry,* 217 F.3d at 815 ("There is a presumption against the waiver of constitutional rights, and for a waiver to be effective it must be clearly established that there was an intentional relinquishment or abandonment of a known right or privilege." (internal quotation marks and citation omitted)). We also note that the *Cherry* Court may not have considered the

waiver/forfeiture distinction, because *Cherry* was decided before *Crawford,* and *Crawford* appears to be the first case in which the United States Supreme Court referred to the doctrine as a "forfeiture."

{35} We also find the reasoning in *Cherry* to be less than compelling. The issue in *Cherry* was whether participants in a drug conspiracy could be said to have waived their confrontation rights when one member of the conspiracy clearly and intentionally procured the witness's absence. *Id.* at 814, 816. The court framed that issue as one of "imputed waiver." The court said:

> The proper scope of such imputed waiver as applied to a criminal defendant is best defined in the context of the Confrontation Clause doctrine of waiver by misconduct. While the Confrontation Clause and the hearsay rules are not coextensive, it is beyond doubt that evidentiary rules cannot abrogate constitutional rights. We therefore read the plain language of Rule 804(b)(6) to permit the admission of those hearsay statements that would be admissible under the constitutional doctrine of waiver by misconduct[.]

*Id.* (internal citation omitted). Despite the court's acknowledgment that the rules of evidence and the Confrontation Clause are not coextensive, this statement seems to boil down to nothing more than an unsupported assertion that they are indeed coextensive with regard to the forfeiture doctrine. In fact, the *Cherry* court offered no other support for its conclusion that the elements of the federal rule are constitutionally mandated. Unlike the special concurrence, ¶ 85, we do not believe that *Reynolds* says anything about whether the intent to silence requirement is required by the constitution. *See Reynolds,* 98 U.S. at 158–61 (holding that the defendant forfeited his confrontation rights where he kept the police from finding his wife so she could not testify, but not addressing the intent requirement). Further, we have been able to find no authority besides *Cherry* that supports the proposition that it is.

{36} Moreover, we do not agree with the *Cherry* Court's rationale for holding that the elements of FRE 804(b)(6) are constitutional-

ly mandated. While it is clear that congressionally promulgated rules cannot afford defendants *narrower* rights than those afforded by the constitution, such rules can certainly afford *broader* rights. That is arguably what FRE 804(b)(6) does. For example, the rule mandates that the forfeiture by wrongdoing doctrine can only be successfully invoked in cases in which the prosecution can show that the defendant procured the witness's absence with the specific intent of preventing the witness from testifying. The prosecution will surely be able to show that the defendant procured the witness's absence in more cases than it will be able to show that the defendant did so with the specific intent of preventing the witness from testifying. As a result, the better reading of the federal rule seems to be that it simply narrows the class of cases in which the doctrine can be invoked, thereby broadening the rights of defendants. Thus, *Cherry* itself does not support the proposition that the elements of the federal rule are constitutionally mandated. We also note that because *Cherry* was exclusively concerned with whether members of a conspiracy could be deprived of their confrontation rights on the basis of actions taken by other members of the conspiracy, the case did not directly consider the intent to silence requirement at all.

{37} In view of the briefs in *Alvarez-Lopez* and *Cherry's* reliance on the waiver doctrine and questionable constitutionalization of the elements of the federal rule, we suspect that our Supreme Court may not have fully considered the pros and cons of imposing the intent to silence requirement in all cases involving forfeiture by wrongdoing. The special concurrence believes that our Supreme Court was aware of the distinction and made a deliberate choice to follow the cases that require an intent to silence. *See* special concurrence at ¶¶ 82–83. In support of this conclusion, the special concurrence cites two cases that were cited in *Alvarez-Lopez, United States v. Dhinsa,* 243 F.3d 635 (2d Cir.2001); *United States v. Mastrangelo,* 693 F.2d 269 (2d Cir.1982), and one case that was cited in *Dhinsa* with a *cf.* signal on the page prior to the page cited in *Alvarez-Lopez, United States v. Miller,* 116 F.3d 641 (2d Cir.1997), *abrogated on other grounds,*

*Rutledge v. United States,* 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996). However, like the cases we referred to above, which required intent to silence, and like the cases cited at ¶ 85 of the special concurrence, these cases did not examine the relative advantages and disadvantages of the requirement. Rather, except for *United States v. Rouco,* 765 F.2d 983, 985–87 (11th Cir.1985), which involved a gun battle with the police in which the defendant shot the officer in an attempt to escape arrest, and except for *Miller,* which involved extreme culpability and little reasoning for its holding that intent to silence is not a prerequisite to admissibility, these cases generally involved fact situations where the intent to silence was clear, and thus there was no reason to question whether the requirement was constitutionally mandated or beneficial from a policy standpoint. *See Dhinsa,* 243 F.3d at 642–43, 650–54 (applying doctrine to the defendant, who was head of a "vast racketeering organization" and was convicted of numerous counts of killing and threatening people who cooperated with police); *Miller,* 116 F.3d at 652–53, 667–69 (applying doctrine to the defendants, who were involved in "a RICO enterprise conducted through a campaign of violent enforcement and retribution"); *Mastrangelo,* 693 F.2d at 271, 273–74 (remanding for evidentiary hearing on the defendant's involvement in death of a witness who was killed on his way to the courthouse to testify against the defendant). In addition, we question whether it can be inferred from an incidental citation contained in a portion of *Dhinsa* other than the portion our Supreme Court cited that our Supreme Court was put on notice of the split in relevant authority.

{38} The special concurrence is also concerned about cases in which domestic violence victims recant, and it cites a few cases in which the allegations are based on revenge or other improper motive. *See* special concurrence at ¶ 79. To be sure, any examination of policy in this area must be informed by the possibility of improper motivation for testimony. Yet, the examination of policy must also be informed by fact that the overwhelming majority of cases of recantation or refusal to cooperate are due to "financial

reasons, fear of retaliation, low self-esteem, or sympathy for the assailant." *See* Tom Lininger, *Evidentiary Issues in Federal Prosecutions of Violence Against Women*, 36 Ind. L.Rev. 687, 707 n. 68 (2003); *see also id.* at 709 n. 76 (indicating that nonprosecution or recantation is epidemic in domestic violence cases, with estimates that such occurs in 80 to 90 percent of the cases).

{39} In sum, we find the circumstances of this case to be materially different from the circumstances of *Alvarez–Lopez*. In this case, for example, it might be inequitable to allow Defendant to reap a benefit, even if an unintended one, from his involvement in the victim's death. Nonetheless, if our Supreme Court misconstrued the law in *Alvarez–Lopez*, it is not our place to attempt to correct any such error. *See State ex rel. Martinez v. City of Las Vegas*, 2004–NMSC–009, ¶ 22, 135 N.M. 375, 89 P.3d 47 ("[W]hile the Court of Appeals is bound by Supreme Court precedent, the Court is invited to explain any reservations it might harbor over its application of our precedent so that we will be in a more informed position to decide whether to reassess prior case law[.]"). Thus, we reiterate our holding that the State is required to prove the elements of the forfeiture by wrongdoing doctrine as they are articulated in *Alvarez–Lopez*.

{40} The State next argues that even if we hold that intent to silence must be shown, we should infer such an intent on the facts of this case because "no reasonable factfinder could fail to infer by a preponderance of the evidence that a desire to silence [the victim] was among Defendant's motives." The State draws support for its conclusion from the fact that the jury in this case found Defendant guilty of intimidating the victim in order to prevent her from reporting the domestic violence to the police. The State also relies on the passage in *Alvarez–Lopez* which notes that:

It may be sufficient to infer under certain facts that a defendant intended by his misconduct to prevent the witness from testifying. For example, we may be able to infer a criminal defendant's murder of a key prosecution witness was intended to prevent the witness from testifying at the defendant's trial.

2004–NMSC–030, ¶ 13, 136 N.M. 309, 98 P.3d 699.

{41} We agree with the State that in some cases, a trial court could simply "infer" from the evidence presented to it that the defendant intended by his misconduct to prevent the witness from testifying. We even agree that such an inference could possibly be made by an appellate court in a case such as the present one where, due to an intervening change in the law, the appellate court is making a decision on the forfeiture doctrine without the benefit of the trial court's having done so. However, this is not such a case.

{42} In order to explain why this is not such a case, we must delve briefly into the evidence that was presented at Defendant's murder trial. *See Romero*, 2005–NMCA–060, 137 N.M. 456, 112 P.3d 1113. The evidence presented consisted primarily of Defendant's statements about the events of the night in question and forensic evidence. *Id.* ¶ 5. Defendant's statements set forth the following facts. Defendant and the victim were together at Defendant's residence, watching television. *Id.* They began to fight and Defendant struck the victim several times. *Id.* Defendant and the victim made up and had consensual sex, and then fought some more. *Id.* At one point, the victim "pinn[ed] Defendant beneath her, punching him in the face and elbowing him in the mouth." *Id.* Then, "after the victim grabbed Defendant by the genitals, he also bit her and struck her again on the side of the head to get her to release her grip." *Id.* Eventually, they stopped fighting and went to sleep. *Id.* When Defendant awoke the next morning, the victim was not breathing, so Defendant went to summon help. *Id.*

{43} The forensic evidence was arguably inconclusive, with the State's expert conceding that there was "no obvious cause of death." *Id.* ¶ 7. However, the expert did state that the death was caused by "complications of mechanical injuries to the head." *Id.* (internal quotation marks omitted). The defense expert testified that the victim died "a natural or accidental death as a result of

[an unrelated] liver condition." *Id.* The jury found Defendant guilty of second-degree murder. *Id.* ¶ 3.

{44} We reversed and remanded for a new trial on the basis that the trial court should have given Defendant's requested jury instructions on nondeadly force self-defense and involuntary manslaughter. *Id.* ¶ 2. Defendant's theory of the case was that when he hit and bit the victim, he was lawfully defending himself with nondeadly force, but due to unusual circumstances including the victim's liver condition, the victim unexpectedly died. *Id.* ¶ 16. We held that on this theory, Defendant was entitled to his requested jury instructions: "The cause of death was disputed, and in the light most favorable to Defendant, the cause of death did not exclude an accidental death caused by the exercise of nondeadly force." *Id.* ¶ 15.

{45} As we held in the murder case, evidence was presented based on which the jury could have found that the victim's death was accidental. A finding of accidental death might support the inference that Defendant did not intend to silence the victim when he committed the acts that contributed to her death. Whether a court would make such a finding as part of its duties to find preliminary questions of fact under Rule 11–104 NMRA by a preponderance of the evidence standard, as opposed to a reasonable doubt standard, is something on which we can only speculate. Thus, because we find below that some of the contested statements do give rise to valid objections under *Crawford*, we remand for the trial court to make factual findings with regard to the elements of the forfeiture by wrongdoing doctrine articulated in *Alvarez–Lopez*. Specifically, the State is required to prove that Defendant procured the victim's absence with the intent to prevent her from testifying. We express no opinion on a proper finding under these facts. We do note that the trial court should hold a new trial and exclude those statements which are testimonial in nature only if it finds that Defendant was not in any way motivated by a desire to prevent the victim from testifying when he committed the acts that contributed to her death. *See Alvarez–Lopez*, 2004–NMSC–030, ¶ 13, 136 N.M. 309, 98 P.3d 699

("The State need not show ... that [the d]efendant's sole motivation was to procure the declarant's absence; rather, it need only show that the defendant was motivated *in part* by a desire to silence the witness." (internal quotation marks and citation omitted)). If the trial court finds the requisite intent, Defendant's convictions will stand.

## III. Analysis of Whether the Victim's Statements Were "Testimonial" in Nature

{46} We now turn to an examination of whether the victim's statements present valid Confrontation Clause objections under *Crawford*. In *Crawford*, the Supreme Court overruled prior precedent and established a new framework for analyzing Confrontation Clause claims. The Court held that the Confrontation Clause is always implicated when "testimonial" statements of an absent witness are admitted. *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354. The Court specifically declined to provide a comprehensive definition of "testimonial," *id.* n. 10, but did set forth the following three categories of statements that are clearly testimonial: (1) "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51–52, 124 S.Ct. 1354 (internal quotation marks and citations omitted). The Court then held that "[w]hatever else the term ["testimonial"] covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 124 S.Ct. 1354. Finally, the Court held that if a statement is testimonial, it may only be admitted if two conditions are satisfied: (1) the declarant is unavailable and (2) the defendant has had a

prior opportunity to cross-examine the declarant. *Id.*

{47} In this case, it is undisputed that the victim is unavailable and that Defendant had no prior opportunity to cross-examine her. Thus, if any of her statements are testimonial, they are inadmissible unless the trial court finds that Defendant forfeited his confrontation rights under the forfeiture by wrongdoing doctrine. We now examine each of the statements individually to determine whether they are testimonial in nature.

## A. The Grand Jury Testimony and the Stationhouse Statement

{48} Under the plain language of *Crawford*, the victim's testimony before the grand jury is testimonial in nature. *See id.* ("Whatever else the term covers, it applies at a minimum to prior testimony ... before a grand jury[.]"). Thus, the grand jury testimony is inadmissible absent a finding that Defendant forfeited his confrontation rights.

{49} We also hold that the statement taken by Lewandowski at the police station is testimonial because it was given in response to a "police interrogation." In *Crawford*, the defendant and his wife Sylvia were both given *Miranda* warnings and questioned at the police station. *Crawford*, 541 U.S. at 38, 65, 124 S.Ct. 1354. The Court held that Sylvia's statement was testimonial because it was given in response to "police interrogation." *Id.* at 52, 53 n. 4, 124 S.Ct. 1354. While declining to give a more specific definition of the term "interrogation," the Court held that "Sylvia's recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition." *Id.*

{50} Many courts have held that statements given in response to formal, structured interviews by law enforcement personnel qualify as testimonial under *Crawford*. *See, e.g., United States v. Saget*, 377 F.3d 223, 228 (2d Cir.2004) (holding testimonial statements to include those involving "a declarant's knowing responses to structured questioning in an investigative environment"); *Commonwealth v. Foley*, 445 Mass. 1001, 833 N.E.2d 130, 133 (2005) ("[S]tate-

ments made in response to police questioning after the scene was secure and the victim had assured the officer she did not want emergency medical attention were made in response to investigatory interrogation. As such, they were testimonial per se."); *State v. Walker*, 129 Wash.App. 258, 118 P.3d 935, 940 (2005) (holding victim's statement testimonial where it was "elicited in response to structured police questioning pursuant to a police investigation").

{51} In this case, the State acknowledges that out-of-state authority supports a holding that the statement taken at the police station is testimonial. The State urges us, however, to hold that the statement is not testimonial because it was introduced to show two types of information: the victim's actual words and her emotional state, i.e., the fact that she was crying and upset. This second type of information, the State argues, provides evidence of physical characteristics and is not testimonial in nature. The State provides no authority for the proposition that when a statement is introduced in part to show the declarant's emotional state, it is somehow removed from the purview of *Crawford*. We note that individuals giving statements to the police are likely to be upset, and we decline to exempt this entire category of statements from scrutiny under the Confrontation Clause.

{52} The circumstances surrounding the statement taken by Lewandowski bear numerous indicia of a formal police interrogation. The interview took place at the police station. Lewandowski testified that his reason for taking the statement was that "[a]t this point I needed to know what really happened." The victim gave responses to a number of questions asked by Lewandowski. All of these factors indicate that the statement, like the statement in *Crawford*, was "knowingly given in response to structured police questioning." *See Crawford*, 541 U.S. at 53 n. 4, 124 S.Ct. 1354. Moreover, the statement was tape recorded, which indicates that the purpose of both Lewandowski and the victim was to memorialize it for future use. We thus hold that the statement is testimonial in nature and, as such, should be

excluded unless the trial court finds that Defendant forfeited his confrontation rights.

### B. The Victim's Statement to the SANE Practitioner

 {53} We next address whether the victim's statement to the SANE practitioner is testimonial. We begin by providing some additional background on the circumstances surrounding the statement. As detailed above, the victim did not initially report that any sexual assault had occurred during the incident in question. Approximately three weeks after the incident, the victim told Lewandowski that Defendant had sexually assaulted her. As a result, Lewandowski made an appointment for the victim to see a SANE practitioner. At trial, Tucker, the SANE practitioner who interviewed the victim, testified that she is a registered nurse who has had "additional classroom and clinical training in dealing with forensic evidence collection, how to obtain the evidence collection, what to do with it, chain of custody, et cetera." She testified that during her interview with the victim, she took a complete statement from the victim and conducted a "head to toe assessment and a genital exam." The trial court allowed Tucker to read the victim's statement into the record and certified Tucker as "an expert in Sexual Assault Nurse Examiner."

{54} We hold that the victim's statement to the SANE practitioner is testimonial because it falls into the third category of evidence labeled testimonial by *Crawford*, "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." 541 U.S. at 52, 124 S.Ct. 1354 (internal quotation marks and citation omitted).

 {55} We first note that the fact that the SANE practitioner is not a government official does not preclude statements given to her from being testimonial. *See, e.g., State v. Mack*, 337 Or. 586, 101 P.3d 349, 352 (Or. 2004) (en banc) (holding statements made to a social worker to be testimonial because she was acting as a "proxy" for the police). However, many cases involving statements given during examinations by non-govern-

ment personnel have focused on the degree to which law enforcement is involved in the examination. This focus makes sense in light of *Crawford's* admonition that "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse." 541 U.S. at 56 n. 7, 124 S.Ct. 1354. In *State v. Snowden*, for example, the Maryland Court of Appeals held that statements made by child victims to a "sexual abuse investigator" were testimonial. 385 Md. 64, 867 A.2d 314, 325 (2005). The court noted that the interviews were "initiated, and conducted, as part of a formal law enforcement investigation," and took place "subsequent to initial questioning . . . by the police and after the identity of a suspect was known." *Id.* The court did also note that "the express purpose of bringing the children to the facility to be interviewed was to develop their testimony for possible use at trial." *Id.* at 326.

{56} Here, the victim went to the interview at Lewandowski's suggestion. He set the interview up and drove her to it. While he did not attend the interview, he apparently waited for the victim while the interview took place. He testified that he did so "just . . . to make sure everything went okay." As in *Snowden*, the interview took place "subsequent to initial questioning" and "after the identity of a suspect was known." *See id.* at 325. Moreover, the victim had already made a formal statement to the police, was aware of the ongoing investigation, and had already testified before the grand jury. Thus, Lewandowski's involvement suggests that a person in the victim's position would likely have recognized that her statements could later be used prosecutorially.

 {57} Next, the State argues that the statement cannot be testimonial because the trial court made a preliminary finding that it was admissible under the hearsay exception for statements made for purposes of medical diagnosis or treatment. *See* Rule 11–803(D) NMRA. The State contends that this ruling necessarily indicates that "[the victim's] motive for making the statement, and . . . Tucker's motive for eliciting it, was *not* to perpetuate her testimony for use in a future trial."

{58} We disagree. Even if a statement falls within the hearsay exception for statements made for the purpose of obtaining medical diagnosis or treatment, it may still be testimonial. *See, e.g., State v. Stahl,* 2005–Ohio–1137, ¶ 13, 2005 WL 602687, at *4 (Ohio Ct.App. Mar. 16, 2005) (rejecting the State's contention that statements made for purposes of diagnosis and treatment are categorically non-testimonial). Indeed, it seems logical that a sexual assault victim might submit to a SANE examination both to seek medical or psychological treatment and to preserve his or her account of the incident. However, while a victim might have both of these reasons in mind, the first counsels against a finding that the statement is testimonial, while the second indicates that the statement should be considered testimonial. Thus, if a victim's primary motivation was to seek medical attention, the statement would be less likely to be testimonial. *See, e.g., People v. West,* 355 Ill.App.3d 28, 291 Ill.Dec. 72, 823 N.E.2d 82, 89 (2005) (holding that parts of the adult sexual assault victim's statement to emergency room personnel that described "the nature of the alleged attack, and the cause of her symptoms and pain" were not testimonial because they fell into the category of statements "made by a patient with a selfish interest in treatment" and were not "accusatory" in nature. (internal quotation marks and citation omitted)); *State v. Moses,* 129 Wash.App. 718, 119 P.3d 906, 912 (2005) (holding a victim's statements to emergency room doctor not testimonial where "the purpose of [the] examination was for medical diagnosis and treatment").

{59} In this case, the facts suggest that the victim's purpose in attending the SANE interview was not merely to obtain medical treatment. First, nearly three weeks elapsed between the incident and the examination, indicating that the victim was not in need of immediate care. Second, in the physical examination, the SANE practitioner found "no evidence of trauma," although she also testified that her findings were not inconsistent with the type of sexual assault the victim had reported. Finally, the content of the statement indicates that the victim was not primarily concerned with getting treatment. The statement did not focus on the sexual assault, but rather recounted the entire incident. There are only two places in the statement where the victim actually referred to the sexual assault. She said, "That's when he sexually assaulted me on the floor. He took off my pants and underwear and penetrated me." When the SANE practitioner asked her what she meant, she replied, "[P]enis in my vagina. . . . I kept telling him no and to stop." Other than these two statements, the victim did not mention the sexual assault. Given these facts, it does not seem that the victim's primary motivation was to obtain treatment. This leads to the conclusion that a person in her position would have known that the information given might be later used at trial.

{60} Finally, we note that some courts have considered the intent of not only the declarant, but also of the person eliciting the statement. For example, in *Hammon v. State,* the Indiana Supreme Court held that a statement is testimonial if it was "given *or taken* in significant part for purposes of preserving it for potential future use in legal proceedings." 829 N.E.2d 444, 456 (Ind.), *cert. granted,* —— U.S. ——, 126 S.Ct. 552, 163 L.Ed.2d 459 (2005) (emphasis added). We agree with this approach and believe that the motive of the person eliciting the statement is relevant for two reasons. First, it bears on the intent and understanding of the declarant. As the Supreme Court put it in *Crawford,* "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U.S. at 51, 124 S.Ct. 1354. Second, the motivation of the listener is relevant due to *Crawford's* admonition regarding "production of testimony with an eye toward trial." *Id.* at 56 n. 7, 124 S.Ct. 1354. If the listener is motivated by a desire to gather evidence, he or she will be more likely to elicit responses that will be useful in a later prosecution, thereby implicating the concerns of *Crawford.*

{61} Here, the SANE practitioner testified that she is specifically trained in "forensic evidence collection" and "chain of custody," and that she has testified as an expert witness on four occasions. Tucker's descrip-

tions of her qualifications and training further lead us to conclude that both Tucker and the victims she interviews significantly after the event would likely realize that the statements given might be used at trial. In view of all of these factors, we hold that the victim's statement to Tucker was testimonial and should thus be excluded absent a finding by the trial court of forfeiture.

## C. The Victim's Statement to Lewandowski at the Scene

{62} Finally, we turn to the statement the victim made to Lewandowski at the time of the incident. We begin by briefly reiterating Lewandowski's testimony. Lewandowski testified that the victim came out of the residence, drove her car about 15 feet toward the officers' location and then got out and ran toward the officers. He said the victim was "crying [and] asking for help" and that she had red marks on her neck and watery eyes. Lewandowski also testified that the victim told him that Defendant "choked her, held a knife to her throat while she was in the bathroom, and ... stated that if he couldn't have her, no one could, and that he would kill her." The trial court apparently ruled that this latter statement was admissible as either an excited utterance or a present sense impression.

{63} This type of on-scene statement to police officers has perhaps generated the most post-*Crawford* caselaw. Many jurisdictions have held statements similar to the one in this case to be non-testimonial. *See Anderson v. State,* 111 P.3d 350, 354 (Alaska Ct.App.2005) ("The great majority of courts which have considered this question have concluded that an excited utterance by a crime victim to a police officer, made in response to minimal questioning, is not testimonial."). As with other statements that are arguably testimonial under *Crawford,* the primary concern is the intent of the declarant and the listener. Many courts have noted that responses to initial, on-scene questions from a police officer are likely motivated by goals other than perpetuating testimony. In *Hammon,* the Indiana Supreme Court held that statements made at the scene to a police officer answering a domestic violence call were not testimonial. The court based its decision on the fact that the officer was "principally in the process of accomplishing the preliminary tasks of securing and assessing the scene." 829 N.E.2d at 458. *See also State v. Greene,* 274 Conn. 134, 874 A.2d 750, 775 (2005) ("[W]here a victim contacts a police officer immediately following a criminal incident to report a possible injury and the officer receives information or asks questions to ensure that the victim receives proper medical attention and that the crime scene is properly secured, the victim's statements are not testimonial in nature because they can be seen as part of the criminal incident itself, rather than as part of the prosecution that follows." (internal quotation marks and citation omitted)); *Commonwealth v. Gonsalves,* 445 Mass. 1, 833 N.E.2d 549, 555–56 (2005) ("We conclude that questioning by law enforcement agents ... other than to secure a volatile scene or to establish the need for or provide medical care, is interrogation [and thus testimonial.]"); *People v. Bradley,* 22 A.D.3d 33, 799 N.Y.S.2d 472, 477 (N.Y.App. Div.2005) ("Preliminary, on-scene interviews are clearly distinguishable from the ex parte testimony found to be excludable on Sixth Amendment grounds in *Crawford.*"); *Spencer v. State,* 162 S.W.3d 877, 881 (Tex.App. 2005) ("[S]tatements made to officers responding to a call during the initial assessment and securing of a crime scene are not testimonial.").

{64} However, some courts have held such statements to be testimonial. In *Lopez v. State,* the court held that a statement made by an upset victim to an officer at the scene of the crime was testimonial. 888 So.2d 693, 700 (Fla.Dist.Ct.App.2004). The court reasoned that "a startled person who identifies a suspect in a statement made to a police officer at the scene of a crime surely knows that the statement is a form of accusation that will be used against the suspect." *Id.* at 699. This appears to be the minority view. *See Contreras v. State,* 910 So.2d 901, 912–13 (Fla.Dist.Ct.App. Sept.14, 2005) (May, J., dissenting) (noting that "*Lopez* has been distinguished and disagreed with by courts across the country" and citing cases).

{65} Many cases have held that this type of statement will usually be non-testimonial, but that the inquiry should be fact-specific and if there are articulable indications that either the declarant or the officer was trying to do more than simply get help or secure the scene, then the statement might be considered testimonial. *See, e.g., State v. Parks,* 211 Ariz. 19, 116 P.3d 631, 642 (Ariz.Ct.App. 2005) ("[P]olice questioning during a field investigation does not automatically exempt the statements from being testimonial."); *Wright,* 701 N.W.2d at 812–13 (holding that "statements made to the police during a field investigation should be analyzed on a case-by-case basis" and establishing an eight-factor test that includes consideration of the purpose of both the declarant and the officer); *State v. Allen,* 171 N.C.App. 71, 614 S.E.2d 361, 365 (2005) ("[W]hether 'interrogation' encompasses a statement made in response to police questioning at the scene of a crime is a factual question that must be determined on a case-by-case basis.").

{66} We prefer this fact-specific inquiry. While on-scene statements to police officers in response to initial questioning will generally be non-testimonial, we hold that such statements should be considered testimonial if there are articulable indications that either the officer or the declarant was trying to procure or provide testimony. However, when it appears that the officer's primary goal was to secure the scene or give immediate aid to victims and the declarant's primary goal was to get aid, the statements will be considered non-testimonial.

{67} We now turn to the facts of this case to see where they fit in the above standard. Lewandowski testified that the victim ran toward the officers, that she had no shoes on and was running through gravel, and that she was "upset" and "crying for help." Lewandowski testified that he "talked to her for just a minute" and then put her in the back of a police car "for her safety and ours" and that "basically all she did was just hold on to me asking for help." Apparently it was during this brief conversation that the victim made the statement about Defendant holding a knife to her throat. Lewandowski also testified as follows: "A few questions we did ask was is there a weapon, are you okay, and it was a real fast conversation. Our main point was to get her into a safe environment just in case he was out somewhere with a weapon." Finally, he testified that "at that point our main concern wasn't [to] investigate her, interview her, our main point was to make sure she was safe and that we were safe and that we were able to get in the house and clear it and maybe try to obtain the subject to detain him."

{68} Under these circumstances, we hold that the victim's statement to Lewandowski that Defendant held her at knifepoint and threatened to kill her was not testimonial under *Crawford.* It is clear from Lewandowski's testimony that his primary goal was to secure the scene and give aid to the victim. He was not conducting an investigation and he was not attempting to procure or preserve testimony for later use at trial. Moreover, his descriptions of the victim indicate that she was primarily concerned with getting help from the police, not with making accusations against Defendant. Thus, we hold that the statement was not testimonial and was properly admitted at trial.

## IV. Admission of the Victim's Statements Was Not Harmless Error

{69} The State next contends that only the victim's statement given at the stationhouse could possibly be testimonial, and that if it is testimonial, its admission constituted harmless error because it was cumulative of other properly admitted evidence. However, we have held that the stationhouse statement, the grand jury statement, and the statement made to Tucker were all testimonial in nature and must be excluded absent a finding that Defendant forfeited his confrontation rights. The State does not argue that the admission of all three of these statements could be considered harmless error. However, we briefly address that possibility and hold that the error was not harmless.

{70} When a constitutional trial error has been committed, "the burden is on the State to demonstrate the error is harmless beyond a reasonable doubt." *State v. Johnson,* 2004–NMSC–029, ¶ 9, 136 N.M.

348, 98 P.3d 998. The "central focus" of this inquiry is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* (internal quotation marks and citation omitted). A reviewing court must make "an objective reconstruction of the record of evidence the jury either heard or should have heard absent the error." *Johnson*, 2004–NMSC–029, ¶ 10, 136 N.M. 348, 98 P.3d 998. An error is not necessarily harmless even when the evidence that was properly admitted constitutes "overwhelming evidence of the defendant's guilt." *Id.* ¶ 11. Error is not automatically harmless when the improperly admitted evidence was cumulative of other properly admitted evidence. *Id.* ¶ 37. Moreover, evidence is not considered "cumulative" if it "corroborates, and therefore strengthens, the prosecution's evidence." *Id.*

{71} In this case, we have held that admission of all three of the victim's detailed statements about the incident are inadmissible under *Crawford.* The State relied heavily on these statements at trial. For example, at the end of closing argument, the prosecutor stated: "Ladies and Gentlemen, you've had ample evidence . . . to conclude that [the victim] told police, told . . . Tucker, told the Grand Jury and through those statements told you exactly what . . . Defendant did to her." Examining the evidence the jury would have heard absent the erroneous admission of these three statements, we note that the State would have had little direct evidence of Defendant's involvement in the victim's injuries. It would have had to rely solely on the statement the victim made at the scene and the testimony of the other witnesses, who essentially testified only to the victim's statements over the phone that Defendant would not let her leave and was holding a knife to her throat. At a minimum, the improperly admitted evidence corroborated this other testimony. Thus, we conclude that the State has not shown beyond a reasonable doubt that there was no " 'reasonable possibility that the evidence complained of might have contributed to the conviction.' " *See Johnson*, 2004–NMSC–029, ¶ 9, 136 N.M. 348, 98 P.3d 998 (quoting *Chapman*, 386 U.S. at 23, 87 S.Ct. 824).

## V. Defendant's Rule 11–404(B) Objections

{72} Lastly, Defendant argues that witness testimony regarding past incidents of domestic violence between himself and the victim was erroneously admitted under Rule 11–404(B). Over Defendant's objection, the trial court allowed Chavez, the victim's roommate, to testify that a few weeks before the events giving rise to the trial, she saw Defendant "shove[ ] [the victim's] head into the wall." Another friend of the victim, Jaramillo, testified regarding an occasion when she had gone with the victim to Defendant's house because Defendant had taken the victim's keys. Jaramillo testified that the victim went into Defendant's house and came out and handed her a folder that contained "personal papers, like her past income tax returns." Then, according to Jaramillo, Defendant took the folder out of her hands and the three of them engaged in a "shoving match over the folders."

{73} Rule 11–404(B) prohibits the admission of "[e]vidence of other crimes, wrongs or acts . . . to prove the character of a person in order to show action in conformity therewith." However, the rule allows evidence of such prior acts "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." We review a trial court's decision to admit evidence under Rule 11–404(B) for abuse of discretion. *Williams*, 117 N.M. at 557, 874 P.2d at 18.

{74} Before the trial court, the State argued that the testimony of Chavez and Jaramillo was admissible under Rule 11–404(B) to show why the victim's friends were concerned about her when she called on the day of the incident and said that Defendant would not let her leave his house. The State also argued that the testimony "goes to . . . Defendant's motive, intent and plan in terms of why [the victim] was over there, and that the bruises and marks were not accidental, and that he was, in fact, holding her against her will[.]" The trial court allowed the testimony of both witnesses for purposes of showing "the motive of . . . Defendant, the intent

in this particular instance, [and] absence of mistake."

{75} Defendant testified that the victim liked experimental sexual practices, such as having him pretend to be a rapist. He testified that on the night of the incident, the victim wanted him to "pull her by the hair and to hit her" and to call her "a bitch and a slut." He also testified that the next morning, the victim was upset because there were "a lot of hickeys on her neck." Defendant claimed the marks on the victim's neck that appeared in the photos introduced by the State were hickeys and not cuts. This testimony indicates that Defendant was arguing that he caused the marks on the victim's neck either by mistake or with the victim's consent. In view of Defendant's testimony, we agree that the testimony of Chavez and Jaramillo was not improper propensity evidence, and we hold that the trial court did not abuse its discretion in ruling that the testimony was relevant to show, among other things, absence of mistake regarding the victim's injuries. *See State v. Jones,* 120 N.M. 185, 187, 899 P.2d 1139, 1141 (Ct.App.1995) (holding prior bad acts evidence is admissible where there is an "articulation or identification of the consequential fact to which the proffered evidence of other acts is directed").

**CONCLUSION**

{76} We hold that the victim's statements before the grand jury, to Lewandowski at the stationhouse, and to the SANE practitioner were testimonial under *Crawford* and that their admission was not harmless error. We also hold that the State is required to prove the four elements of the forfeiture by wrongdoing doctrine. Thus, we remand for the trial court to make factual findings with regard to those elements. If the trial court finds that Defendant forfeited his confrontation rights under *Alvarez–Lopez,* his convictions will stand. If the trial court finds that he did not, the Defendant is entitled to a new trial, at which the three testimonial statements will be inadmissible.

{77} **IT IS SO ORDERED.**

I CONCUR: CELIA FOY CASTILLO, Judge.

MICHAEL E. VIGIL, Judge (specially concurring).

VIGIL, Judge (specially concurring).

{78} I write separately only to disagree with the majority's criticism of the *Alvarez–Lopez* requirement of a foundation showing that a defendant intended by his misconduct to prevent the declarant from testifying before hearsay of that unavailable witness may be admitted as substantive evidence against a defendant in a criminal trial under the constitutional doctrine of waiver by misconduct. Under this doctrine, a defendant's constitutional right to confrontation under the Sixth Amendment, and therefore his hearsay objection as well, is forfeited by his own wrongdoing. *Reynolds,* 98 U.S. at 158.

{79} I do not agree that the State has presented "several compelling reasons why a showing of intent to silence should not be required" (Majority Opinion, ¶ 30), in "cases of the murder of the witness or the death of the witness arising out of a domestic violence situation." Majority Opinion ¶ 33. My disagreement is primarily on policy grounds. It is well documented that victims of domestic violence may recant their testimony on the witness stand or seek to minimize the effects of domestic violence on themselves or others. *See* Cynthia L. Barnes, Annotation, *Admissibility of Expert Testimony Concerning Domestic–Violence Syndromes to Assist Jury in Evaluating Victim's Testimony or Behavior,* 57 A.L.R. 5th 315, 1998 WL 141644 (1992). It is also equally true that self-serving, untrue statements, sometimes motivated by revenge, are made by partners in the context of domestic violence allegations. *See Adams v. State,* 727 So.2d 983, 983 (Fla. Dist.Ct.App.1999) (affirming conviction of perjury after wife filed a false affidavit in a domestic violence action); *Dix v. State,* 267 Ga. 429, 479 S.E.2d 739, 742 (1997) (recognizing that a client can make self-serving statements to her attorney and paint a picture of the marital relationship that is inaccurate and biased in considering whether statements made to her attorney are admissible in a prosecution of husband for murdering his ex-wife). Practitioners dealing with domestic violence know of these contradictions, and our own cases recognize the problem. *See*

*Lujan ex rel. Lujan v. Casados–Lujan,* 2004–NMCA–036, ¶ 10, 135 N.M. 285, 87 P.3d 1067 (recognizing that the motivation for a domestic abuse case can be to further the parent's interest); *State v. Buck,* 33 N.M. 334, 338, 266 P. 917, 919 (1927) (recognizing, in a domestic violence case, that the admission of a spontaneous declaration is often sought where the declarant has died. "In such cases great caution is to be exercised. The danger of admitting merely self-serving declarations, or those prompted by revenge, must be guarded against."). I therefore hesitate to recognize a special exception to admit hearsay evidence substantively in a category of cases where contradictory, self-serving statements are known to be made. It must be remembered that once a determination is made that the constitutional right of confrontation has been waived, the hearsay is admissible as substantive evidence, regardless of its reliability. Even the catch-all provision governing the admissibility of hearsay of an "unavailable" witness in our own Rules of Evidence recognizes that intent is relevant. "A declarant is not unavailable as a witness if [her] exemption, refusal, claim of lack of memory, inability or absence is *due to the procurement or wrongdoing* of the proponent of a statement *for the purpose of preventing the witness from attending or testifying.*" Rule 11–804(A) NMRA (emphasis added).

{80} Further, I cannot agree to recognizing a special hearsay exception "in cases of the murder of the witness or the death of the witness arising out of a domestic violence situation." It is perfectly conceivable, as this case demonstrates, for a defendant to have *accidentally* killed someone with no intention of preventing them from testifying. Nevertheless, the majority would allow admission of the deceased's hearsay. This is contrary with the principle that there is a presumption against the waiver of a constitutional right, and that for a waiver to be effective, there must be an intentional relinquishment or abandonment of the right. *See State v. Herrera,* 2004–NMCA–015, ¶ 8, 135 N.M. 79, 84 P.3d 696. Additionally, it would be anomalous for the hearsay to be excluded in a white collar crime case because no showing could be made that the defendant intended by his misconduct to prevent the declarant from testifying, but admitted in a homicide case even if all the evidence was that the defendant did not have such an intent.

{81} The first basis for the majority's criticism is its view that the requirement arises out of a confusion over the "proper terminology" used to describe the constitutional doctrine. Specifically, the majority agrees with certain post *Alvarez–Lopez* cases which describe a distinction between "waiver" which conceptually supports an intent element and "forfeiture" which does not conceptually require an intent element. The majority agrees that it is more appropriate to view the constitutional doctrine as grounded on "forfeiture" than "waiver" and therefore supports disposing of the intent element. Further, since the authorities cited were decided after *Alvarez–Lopez,* the majority suggests that our Supreme Court may have been misled by this confusion over the "proper terminology" used to describe the constitutional doctrine. Majority Opinion ¶ 30–34.

{82} I do not believe our Supreme Court was misled by any such confusion. Instead, I believe our Supreme Court was fully conscious of cases holding there is no intent requirement for the constitutional doctrine to apply, and deliberately chose to follow those cases which require intent.

{83} *Alvarez–Lopez* quotes the following from the Second Circuit opinion of *Mastrangelo,* 693 F.2d at 272–73: "If a witness' silence is procured by the defendant himself, whether by chicanery, by threats, or by actual violence or murder, the defendant cannot then assert his confrontation clause rights[.]" *Alvarez–Lopez,* 2004–NMSC–030, ¶ 8, 136 N.M. 309, 98 P.3d 699. *Alvarez–Lopez* also specifically quotes *Dhinsa,* 243 F.3d at 653, that "Rule 804(b)(6) [of the Federal Rules of Evidence] 'was intended to codify the waiver-by-misconduct rule as it was applied by the courts at that time.'" *Alvarez–Lopez,* 2004–NMSC–030, ¶ 9, 136 N.M. 309, 98 P.3d 699. On the very same page referenced by *Alvarez–Lopez,* the Second Circuit *Dhinsa* court refers to its own opinion of *Miller,* 116 F.3d at 668, as "holding that neither the existence of an ongoing proceeding nor a finding that the defendant's intention was to prevent the

declarant from testifying is required to admit the declarant's out-of-court statement." *Dhinsa,* 243 F.3d at 652–53. *Miller* specifically states, "Although a finding that defendants' purpose was to prevent a declarant from testifying[ ] is relevant, such a finding is not required." *Id.* at 668 (internal quotation marks, brackets, and citation omitted).

{84} Despite its clear knowledge of these authorities, our Supreme Court made a conscious decision in *Alvarez–Lopez* to reject them and to require the State to establish by a preponderance of the evidence that "the defendant intended by his misconduct to prevent the declarant from testifying" as one of the elements of waiver by misconduct. 2004–NMSC–030, ¶ 10, 136 N.M. 309, 98 P.3d 699. Finally, our Supreme Court stated in *Alvarez–Lopez* that "[o]ne of the primary purposes of the forfeiture by wrongdoing rule is to deter criminals from intimidating or 'taking care of' potential witnesses." *Id.* ¶ 14 (internal quotation marks and citation omitted). Our Supreme Court therefore concluded, "[w]ithout a showing that [the defendant] intentionally prevented [the witness] from being a witness against him, this purpose is not served by admitting the [hearsay] testimony." *Id.*

{85} Secondly, the majority suggests that the requirement arises out of misplaced reliance upon *Cherry,* because *Cherry* improperly equates the Federal Rule of Evidence 804(b)(6) requirement that "the defendant intended by his misconduct to prevent the declarant from testifying" as also being constitutionally required to admit the hearsay of an unavailable witness. Majority Opinion ¶¶ 24, 35–36. This reasoning overlooks the fact that when Rule 804(b)(6) was adopted in 1997, the defendant intended by his misconduct to prevent the witness from testifying in virtually every case in which the constitutional waiver doctrine was recognized. *See, e.g., United States v. White,* 116 F.3d 903, 909–12 (D.C.Cir.1997) (involving the murder of a potential witness that the defendant suspected was working with the police); *Houlihan,* 92 F.3d at 1278 (concluding that a defendant waives his constitutional confrontation rights by murdering a potential witness to prevent the witness from testifying); *United States v.*

*Thai,* 29 F.3d 785, 814–15 (2d Cir.1994) (involving murder of potential witness); *United States v. Aguiar,* 975 F.2d 45, 47 (2d Cir. 1992) (holding that defendant waived his confrontation rights by threatening witness not to testify); *Rouco,* 765 F.2d at 985, 995 (involving murder of undercover police officer involved with the defendant in drug transactions while in the process of arresting the defendant); *United States v. Thevis,* 665 F.2d 616, 630 (5th Cir.1982) ("We conclude that a defendant who causes a witness to be unavailable for trial [by murdering him] for the purpose of preventing that witness from testifying also waives his right of confrontation[.]"); *Steele v. Taylor,* 684 F.2d 1193, 1199, 1201 (6th Cir.1982) (concluding that the constitutional waiver was applicable where the defendant caused a witness under his control to refuse to testify based on the fifth amendment privilege); *United States v. Balano,* 618 F.2d 624, 629–30 (10th Cir.1979) (holding that witness grand jury testimony was admissible when defendant waived his constitutional right of confrontation by making witness unavailable by threats to his life), *overruled on other grounds as recognized by United States v. Cherry,* 217 F.3d 811 (10th Cir.2000); *United States v. Carlson,* 547 F.2d 1346, 1354 (8th Cir.1976) (same). *But see Miller,* 116 F.3d at 668 (stating that while a finding that the defendant's purpose is to prevent witness from testifying is relevant, it is not necessary); *Mastrangelo,* 693 F.2d at 272–73 ("[I]f a witness' silence is procured by the defendant himself, whether by chicanery, by threats, or by actual violence or murder, the defendant cannot then assert his confrontation clause rights[.]") (internal quotation marks and citations omitted). Moreover, the United States Supreme Court has not stated that this requirement of the rule is not constitutionally required. In fact, *Crawford* cites *Reynolds,* 98 U.S. at 158–59, as recognizing the doctrine of forfeiture by wrongdoing. *Crawford,* 541 U.S. at 62, 124 S.Ct. 1354. *Reynolds* applied the common law and held that when the defendant kept the witness away from his trial, that conduct waived his constitutional right of confrontation. *Id.* at 158–60. Since *Reynolds* was not criticized, and Rule 804(b)(6) remains unchanged, I disagree with the majority's criticisms.

{86} For the foregoing reasons, I specially concur.