2005-NMCA-060

112 P.3d 1113

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Anthony ROMERO, Defendant–Appellant.**

No. 24390.

Court of Appeals of New Mexico.

March 14, 2005.

Certiorari Granted, No. 29,159,
May 3, 2005.

Patricia A. Madrid, Attorney General, Santa Fe, Joel Jacobsen, Assistant Attorney General, Albuquerque, for Appellee.

John Bigelow, Chief Public Defender, Will O'Connell, Assistant Appellate Defender, Santa Fe, for Appellant.

## OPINION

PICKARD, J.

{1} On motion for rehearing, the opinion filed March 1, 2005, is withdrawn, and the following opinion is substituted in its place. The motion for rehearing is otherwise denied.

{2} Defendant was convicted of second degree murder for the beating death of his wife. The cause of death was contested at trial, with Defendant presenting expert testimony that the death was caused by a liver condition and the State presenting expert testimony that the death was caused either by smothering in the course of a kidnaping or rape, or as a result of multiple complications of mechanical injuries to the head, i.e., being beaten about the head. This case requires us to decide whether Defendant was entitled to instructions on nondeadly force self-defense or involuntary manslaughter based on these facts. We hold that both of these instructions are applicable to the facts of this case, where there was evidence, although contradicted, that the force Defendant used was necessary to protect himself from attack and that this force would ordinarily not result in death or great bodily harm, but unexpectedly did so result in this case. We therefore reverse the conviction. Defendant also raises the issue that his sentence was improperly aggravated because there was no jury finding beyond a reasonable doubt of any aggravating factors. This issue was recently decided in Defendant's favor in *State v. Frawley*, 2005–NMCA–017, ¶¶ 1, 11–14, 137 N.M. 18, 106 P.3d 580, *cert. granted*, 2005-NMCERT-002, 137 N.M. 266, 110 P.3d 74, [no. 29,011, (Feb. 8, 2005)], but we need not reach it here in light of our disposition.

## FACTS AND PROCEEDINGS

{3} Defendant was charged with first degree murder (deliberate intent or in the commission of the felonies of kidnaping or criminal sexual penetration), criminal sexual penetration, kidnaping, three counts of tampering with evidence, and escape from a community custody electronic monitoring program. At trial, the jury was instructed on these charges, as well as the lesser included offenses of second degree murder and voluntary manslaughter for the murder count, and various lesser included offenses on the kidnaping and criminal sexual penetration counts. The jury acquitted Defendant of kidnaping, criminal sexual penetration, their lesser included offenses, and one count of tampering with evidence; it convicted Defendant of second degree murder and the remaining counts of tampering and escape. This appeal involves only the murder conviction.

{4} The charges arose from the death of Defendant's wife (the victim). It was undisputed that the marriage involved domestic violence. Several months before her death, the victim had kicked Defendant out of the house and obtained a restraining order against him. One month later, an incident occurred at the place where Defendant was living that resulted in Defendant's being convicted of aggravated battery and aggravated assault against a household member. As a result of his arrest for this incident, Defendant was put on electronic monitoring and instructed to have no contact with the victim. Nonetheless, there was evidence that Defendant contacted the victim, stating his eagerness to reconcile. The evidence also revealed that the victim was not blameless in her contacts with Defendant, inasmuch as both the prior incident and the incident that resulted in her death occurred at the place

Defendant was living, the victim's having gone there.

{5} The evidence concerning the night of the victim's death consisted of Defendant's statements to others and the forensic testimony. Defendant's statements indicated that the victim came to his room at 3:00 in the morning and was very intoxicated. They watched television and then began trading insults. The victim urinated in her pants and took her hand and rubbed Defendant's face with the urine. The couple then fought physically (including a strike by Defendant that made the victim's nose bleed), made up, and fought again, after which they made up, made love, and fought again. This fighting included the victim's pinning Defendant beneath her, punching him in the face, and elbowing him in the mouth, during which time Defendant bit her. Defendant admitted that he hit the victim four or five times during the last fight and, after the victim grabbed Defendant by the genitals, he also bit her and struck her again on the side of the head to get her to release her grip. Eventually, they stopped fighting and went to sleep. When Defendant woke up at 9:30, the victim was not breathing, and Defendant went to his parents' house nearby to summon help. Defendant turned himself in and an officer saw that he had fingernail and other scratches on his face and neck and redness on his shoulder; the officer remarked that the fight appeared to be "pretty vicious" by looking at Defendant.

{6} The evidence showed that the victim had two black eyes; bleeding on the white of one eye; bruises and scrapes around the forehead, lips, ear, and nose; a broken nose; bleeding into the scalp; small bruises on the strap muscles of the neck; defensive wounds to the hands; and numerous bite marks. The evidence also showed that the victim had a blood alcohol content of .082 percent at the time of death and a liver condition often associated with obesity or consumption of alcohol. The victim was slightly over five feet tall and weighed 155 pounds.

{7} The medical evidence concerning the cause of death was disputed. The State's expert explained that it was a complex case with no obvious cause of death. She testified that there was no reason for the victim to be dead except for the possibility of injuries to the brain or asphyxia, such as by smothering, which could explain the scraping around the nose or the bruises to the neck. There was testimony, however, that the autopsy report did not reveal evidence of injury to the brain or significant indications of asphyxia, perhaps because the victim did not live long enough after injury for these indications to manifest themselves. Nonetheless, the State's expert opined that the victim died as a result of "complications of mechanical injuries to the head," which would include all of the possibilities of brain injury, mechanical occlusion of the nose, and strangulation, all being in the presence of alcohol, which would compromise the victim's life systems. After consultation with colleagues, the State's expert said there was no doubt that this was a homicide, as it fit the pattern of sexual homicide. The State's expert stated that "[the victim] had had intercourse; [s]he was in bed.... [s]he had bite marks. All of those things go together in forensic pathology. Asphyxia, beating, bite marks, sex, domestic violence, all go together." The defense expert testified that the victim died a natural or accidental death as a result of the liver condition because there was no other clear cause of death, although he acknowledged that the State's theories could be possibilities.

## DISCUSSION

{8} Defendant contends that the trial court erred in refusing his requested instructions on nondeadly force self-defense, UJI 14–5181 NMRA, and involuntary manslaughter, UJI 14–231 NMRA. The propriety of jury instructions is a mixed question of law and fact. *State v. Gaitan*, 2002–NMSC–007, ¶ 10, 131 N.M. 758, 42 P.3d 1207. When considering a defendant's requested instructions, we view the evidence in the light most favorable to the giving of the requested instruction. *State v. Hill*, 2001–NMCA–094, ¶ 5, 131 N.M. 195, 34 P.3d 139. With those facts in mind, we then review the issue de novo. *Id.; see Gaitan*, 2002–NMSC–007, ¶ 10, 131 N.M. 758, 42 P.3d 1207. In the case of self-defense, there must be some evidence, even if slight, to support the defense. *State v. Duarte*, 1996–NMCA–038, ¶ 3, 121 N.M.

553, 915 P.2d 309. In the case of lesser included offense instructions, there must be some view of the evidence that could sustain a finding that the lesser offense was the highest degree of crime committed. *State v. Pettigrew,* 116 N.M. 135, 138, 860 P.2d 777, 780 (Ct.App.1993).

{9} The trial court denied the instruction on self-defense, and the State supports such denial, on the ground that the instruction on nondeadly force self-defense is inapplicable as a matter of law when the victim dies. The trial court also denied the instruction on involuntary manslaughter. The State supports this denial on the grounds that, because self-defense was negated, there was no lawful act to be committed in an unlawful manner, the battery committed on the victim was not a misdemeanor, and the Supreme Court rejected involuntary manslaughter as a verdict in cases of imperfect self-defense in *State v. Abeyta,* 120 N.M. 233, 240, 901 P.2d 164, 171 (1995), *abrogated on other grounds by State v. Campos,* 1996–NMSC–043, ¶ 32 n. 4, 122 N.M. 148, 921 P.2d 1266. Under the facts of this case, we disagree with enough of these propositions to warrant a reversal.

{10} The premises underlying the State's argument concerning the self-defense instructions are that there are two uniform jury instructions, UJI 14–5171 NMRA and UJI 14–5181, one for deadly force and one for nondeadly force, and that the former is used when death is the result, and the latter is used when there is no death. (There is also a deadly force self-defense instruction for use when death does not result. UJI 14–5183 NMRA.) These premises are logical, at least on first glance, and there are cases from other jurisdictions that support them. *See, e.g., State v. Rhodes,* 688 So.2d 628, 640 (La.Ct.App.1997) (stating, without much analysis, in response to a defendant's argument that his requested instruction on nondeadly force should be given, that such instruction should be given only when the force does not result in death and that when the force does result in death, the stricter standard requiring defendant to reasonably believe he is in imminent danger of death or great bodily harm applies); *Ferrel v. State,* 55 S.W.3d 586, 592 (Tex.Crim.App.2001) ("Because we

have found that the actual blow of the bottle indisputably caused serious bodily injury to [the victim], [the defendant] by definition used deadly force.").

{11} But we are more persuaded by cases such as *Southard v. State,* 422 N.E.2d 325, 330 (Ind.Ct.App.1981), *Commonwealth v. Bastarache,* 382 Mass. 86, 414 N.E.2d 984, 996 (1980), and *State v. Hare,* 575 N.W.2d 828, 832–33 (Minn.1998). In *Southard,* the court stated that "self-defense is available to an accused who accidentally kills his assailant while asserting reasonable force to repel the assailant." 422 N.E.2d at 330. In *Bastarache,* the court said that a defendant could use "nondeadly force to protect himself, even from a drunk susceptible to injury, if he reasonably believed that his personal safety ... was in peril," even in cases of the death of the victim. 414 N.E.2d at 996 and n. 15.

{12} *Hare* is the case that is most closely analogous to this case. After stating that instructions on self defense must be given with "analytic precision," the court continued:

Hare contends that the trial court should have given [the nondeadly force self defense instruction] in this case because he claimed that [the victim's] death was accidental. This contention has merit. We have repeatedly cautioned trial courts that when a defendant, asserting self-defense, claims that the resulting death was unintentional, [the deadly force self defense instruction] is inappropriate and that [the nondeadly force self defense instruction] is likely to better fit the facts of the case. For example, ... this court noted that [the deadly force self defense instruction] is useful only when the death was intended. * * * When a defendant claims that he pointed a gun in self-defense but that the shooting was accidental, [the deadly force self defense instruction] clearly does not fit. Likewise, ... this court made it clear that if a defendant claims that he intentionally stabbed the victim in self-defense but without intending to kill the victim, the language in [the deadly force self defense instruction] providing, "the killing must have been done in the belief that * * *" is inappropriate because it implies that the

defendant must believe it necessary to kill in order for the killing to be justified. 575 N.W.2d at 833 (some internal quotation marks, footnote, and citations omitted).

{13} We are of the opinion that the propositions in these cases are most consistent with existing New Mexico law. For example, in *State v. Gallegos*, 2001–NMCA–021, ¶¶ 13, 18, 130 N.M. 221, 22 P.3d 689, we held that a defendant was entitled to self-defense instructions even though she claimed the death was accidental. In fact, our uniform jury instructions so contemplate. Although use note 1 to UJI 14–5181 states that it is for use in nonhomicide cases, use note 4 instructs to use the phrase "The force used by defendant ordinarily would not create a substantial risk of death or great bodily harm" if the defendant's actions do result in death, thereby indicating that UJI 14–5181 is contemplated to be used in certain homicide cases.

{14} The State contends that the Committee Commentary to this use note suggests that it is to be used when the defendant "unintentionally kills a third person in self-defense." We do not read the Commentary so restrictively. While the phrase should certainly be used in the case of an unintentional killing of a third person during the exercise of self-defense, we do not believe that the Commentary was intended to cover the field.

{15} In this case, in the light most favorable to Defendant, the evidence was that he was both humiliated and attacked by the victim. The attack, consisting of hitting, scratching, pinning down, and grabbing, allowed Defendant to respond with the like force of hitting, punching, grabbing, and biting. The victim's injuries, in the light most favorable to Defendant, were a broken nose, and various cuts and bruises. The cause of death was disputed, and in the light most favorable to Defendant, the cause of death did not exclude an accidental death caused by the exercise of nondeadly force. The nondeadly force self-defense instruction should have been given.

■ {16} For similar reasons, the involuntary manslaughter instruction should have been given. For purposes of this instruction, Defendant was not contending imperfect self-defense, i.e., that he used excessive force while otherwise lawfully defending himself. *See Abeyta*, 120 N.M. at 241, 901 P.2d at 172. His contention was that he was always in the lawful exercise of self-defense, but that unusual circumstances caused the victim to die as a result of that lawful exercise, for which the jury might find him culpable.

■ {17} Involuntary manslaughter includes the killing of a human being either in the commission of an unlawful act not amounting to a felony; in the commission of a lawful act that might produce death, in an unlawful manner; or in the commission of a lawful act that might produce death without due caution or circumspection. *State v. Salazar*, 1997–NMSC–044, ¶ 54, 123 N.M. 778, 945 P.2d 996. As we have held that self-defense was available to Defendant, the jury could have found that his beating of the victim was in the commission of a lawful act, but without due caution or circumspection due to her drunken state and liver condition. Further, if the jury so found, it would necessarily find that involuntary manslaughter was the highest degree of offense committed. We need not discuss the other methods of possibly committing involuntary manslaughter; it is sufficient if one applies to these facts.

{18} To the extent that the State argues that the beating inflicted on the victim was severe and therefore "her death does not belong in the category of the least-culpable homicides," we point out that the State is viewing the evidence in the light most favorable to the conviction, as it is entitled to do when defending against a sufficiency of the evidence contention. *See State v. Barber*, 2004–NMSC–019, ¶ 33, 135 N.M. 621, 92 P.3d 633. However, when evaluating a defendant's right to have the jury instructed in accordance with the defendant's tendered instructions, we view the evidence in the light most favorable to the giving of the requested instruction. *Hill*, 2001–NMCA–094, ¶ 5, 131 N.M. 195, 34 P.3d 139.

{19} The State argues that permitting an involuntary manslaughter instruction under the facts of this case would be contrary to the doctrine that defendants take their victims as they find them. *See, e.g., State v. Munoz*, 1998–NMSC–041, ¶¶ 19–22, 126 N.M. 371, 970 P.2d 143; *State v. Duffy*, 1998–

NMSC–014, ¶¶ 2, 28, 126 N.M. 132, 967 P.2d 807. However, these cases are distinguishable inasmuch as the defendants in them did not claim that their actions that caused the death were lawful. Their claim was limited to the notion that such actions as they took would not ordinarily cause death. Here, Defendant is claiming both that his actions were lawful and that they would not ordinarily cause death.

{20} The State contends that Defendant's defense was essentially a reasonable doubt defense in the sense that he denied that his actions proximately caused the victim's death, at least according to the testimony of his expert. However, a jury could have found that his actions did proximately cause the victim's death, but that those actions were privileged, nondeadly force self-defense that had accidental consequences because of the effect of alcohol on the victim's life systems. Moreover, for the proximate cause defense to prevail, Defendant had to rely on the jury's reasonable doubt that the death was a foreseeable result of Defendant's actions or that Defendant's act was a significant cause of her death. *See* UJI 14–134 NMRA (defining proximate cause). We do not believe that a jury would entertain any reasonable doubt as to the fact that Defendant's acts were a significant cause of the victim's death.

█ {21} While there might be a reasonable doubt about whether the death was foreseeable, we do not believe a simple foreseeability instruction adequately conveys to the jurors the idea that they should convict Defendant of involuntary manslaughter if they find that he undertook reasonable self-defense measures in response to the victim's hitting him and squeezing his genitals, but without due caution and circumspection, thereby accidentally causing the victim's death. Nor does it convey to the jurors that they should acquit if they found that Defendant undertook reasonable self-defense with due caution and circumspection, but still accidentally caused the victim's death. A defendant is entitled to have the jury instructed on his defenses with some semblance of liberality. *Poore v. State,* 94 N.M. 172, 174, 608 P.2d 148, 150 (1980). The lone foreseeability instruction did not adequately instruct on Defendant's theory of the case.

█ {22} The State also contends that Defendant's argument to the trial court negated his entitlement to the jury instructions he requested in writing. In determining whether instruction issues are properly preserved, we generally require evidence to support the instruction under the applicable standard and a tender of correct instructions. *See State v. Diaz,* 121 N.M. 28, 30, 908 P.2d 258, 260 (Ct.App.1995). There is no contention here, apart from those that we have discussed and rejected above, that the tendered instructions were erroneous. Instead, the State contends that during the instruction conference, defense counsel made some concessions that provided the trial court with a rationale for denying the instructions, specifically that defense counsel told the trial court that his position was that there was nothing that Defendant did that killed the victim. We have considered the full colloquy between the trial court and counsel and do not believe that defense counsel conceded away Defendant's right to have instructions on his theory of the case. The trial court was aware of Defendant's theory of self-defense as well as his theory of entitlement to an involuntary manslaughter instruction. The trial court ruled, as argued by the State on appeal, that the evidence and law did not support either instruction. Under these circumstances, it would be an unwarranted use of the preservation rule to hold that Defendant's issues were not preserved because counsel misled the trial court. *Cf. id.* at 33–34, 908 P.2d at 263–64 (holding that where the defendant tendered an incorrect instruction, but offered the correct instruction orally and the trial court understood the issue being raised and erroneously ruled on the merits, the appellate court would reach the merits of the issue).

## CONCLUSION

{23} We reverse Defendant's conviction for second degree murder and remand that count for a new trial.

{24} **IT IS SO ORDERED.**

CASTILLO and VIGIL, JJ., concur.