This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-36559

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**MCCLELLAN CALHOUN, JR.,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Gary L. Clingman, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Meryl E. Francolini, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

### MEMORANDUM OPINION

**IVES, Judge.**

**{1}** Defendant McClellan Calhoun appeals his conviction for involuntary manslaughter. On appeal, Defendant challenges the jury instructions and the sufficiency of the evidence. With respect to the jury instructions, Defendant argues that: (1) the district court committed fundamental error when it failed to give the jury a "no retreat" instruction, (2) the district court committed fundamental error when it failed to instruct the jury on defense of another, and (3) cumulative error in the instructions requires

reversal. Defendant also challenges the sufficiency of the evidence, arguing that the State failed to prove beyond a reasonable doubt that his actions were the cause of death and that he should have known of the danger involved in his actions. We affirm.

## BACKGROUND

**{2}** Defendant was charged with involuntary manslaughter based on his participation in an altercation at an Allsups in Hobbs in which seventy-four-year-old Marvin Scarber died. The evidence was undisputed that Mr. Scarber had been shoveling snow to clear the parking lot of the Allsups, when Defendant arrived with his wife, and a friend, Cleve McKenzie, and parked his vehicle near one of the pumps.

**{3}** Rosalinda Quarles testified that she was working inside the Allsups, when Defendant came in and said that someone needed to come out to deal with Mr. Scarber because he was acting angry and agitated and was throwing snow at Defendant's car. Ms. Quarles sent out another employee, while she continued dealing with customers inside the store. A different customer then came in and said that someone needed to call the police, and Ms. Quarles called 911. She then went outside and saw Mr. Scarber lying on the ground by a gas pump.

**{4}** Jeremy Rusk testified that he was pumping gas at the Allsups and heard the sound of a woman shrieking. Mr. Rusk testified that he saw a man kick Mr. Scarber in the chest as Mr. Scarber was falling to the ground. Mr. Rusk testified that he then saw a woman throw a snow shovel, and that the man who had kicked Mr. Scarber walked off. Mr. Rusk testified that Mr. Scarber then attempted to get to his feet, staggered for a few steps, and fell once more to the ground. Mr. Rusk went to Mr. Scarber and saw that he was unresponsive and had blood on his face. Mr. Rusk administered Cardiopulmonary Resuscitation (CPR) to Mr. Scarber, which he continued until emergency personnel arrived.

**{5}** Uryel Hernandez was ten years old at the time of the incident. Uryel testified that he arrived at the Allsups with his family, and saw a person whom he believed to be Geneva's grandfather shoveling snow away from the gas pumps. Uryel testified that he heard a man start yelling at the grandfather, and he then saw the man kick the grandfather in the back. The grandfather fell to the ground, got back up, and then some time after fell to the ground again.

**{6}** Dr. Cline-Parhamovich, a forensic pathologist with the Office of the Medical Examiner, testified regarding Mr. Scarber's injuries and the manner of death. She also testified that Mr. Scarber had bruising to his head and face due to blunt force trauma, which was consistent with being punched. Dr. Cline-Parhamovich testified that the blunt force trauma itself was not lethal, but that the cause of death was a lethal cardiac arrhythmia brought about by intense emotional and physical trauma. Dr. Cline-Parhamovich's autopsy revealed that Mr. Scarber had a significantly enlarged heart, and that he had undergone a prior heart surgery. Mr. Scarber had scar tissue around his heart and two coronary artery bypass grafts. Dr. Cline-Parhamovich testified that Mr.

Scarber had severe disease in both his native arteries and the grafts, and his heart muscles showed evidence of a prior heart attack that had gone through the healing process. Mr. Scarber had mild to significant levels of blockage in his coronary arteries and the grafts. Dr. Cline-Parhamovich testified that, due to the condition of his heart, Mr. Scarber was predisposed to developing a lethal arrhythmia. Wayne Scarber, Mr. Scarber's son, also testified that his father had undergone a quadruple bypass surgery over a year prior to the incident, in November of 2014.

**{7}** Defendant testified that he arrived at the Allsups with his wife and Mr. McKenzie, and Mr. Scarber immediately began shoveling ice and snow at his car. Defendant went into the Allsups to ask the manager to have someone deal with Mr. Scarber because Defendant believed he was "talking crazy." Defendant testified that from inside the store, he saw Mr. Scarber hold up a shovel to Mr. McKenzie, and he again asked for someone to go outside. Defendant then saw Mr. Scarber standing in front of his wife. Defendant went back outside at that point and stood next to his wife, while Mr. Scarber and his wife continued to argue. Defendant testified that he and Mr. McKenzie asked the Allsup's employee who they could call about Mr. Scarber.

**{8}** Defendant testified that, at that point, Mr. Scarber began shoveling snow again and hit him twice in the shin with the shovel. Although Defendant told him not to do that again, Mr. Scarber hit Defendant several more times with the shovel and threatened him. Defendant testified that when Mr. Scarber stood in an offensive position and tried to bring the shovel up. Defendant testified that he hit Mr. Scarber once, and then when Mr. Scarber tried to do something else, Defendant hit him again. Mr. Scarber then dropped the shovel and stumbled into the trash can. Defendant testified that Mr. Scarber got up and came towards him again and then walked away. Defendant and his group then got in their vehicle and left.

**{9}** Defendant was ultimately convicted by the jury of involuntary manslaughter, and this appeal follows. Additional facts are included in the discussion below.

## DISCUSSION

### I. The State Presented Sufficient Evidence to Convict Defendant of Involuntary Manslaughter

**{10}** We begin by considering Defendant's challenge to the sufficiency of the evidence because resolution of this issue in Defendant's favor would dispense with the need to consider Defendant's arguments relating to the jury instructions. *See State v. Zamora*, 2005-NMCA-039, ¶ 22, 137 N.M. 301, 110 P.3d 517 (recognizing that a defendant is entitled to dismissal of the charges if the evidence at trial was insufficient to sustain the conviction). However, as a preliminary matter, we must reject the State's argument that Defendant waived his right to challenge the sufficiency of the evidence on appeal by testifying at trial and presenting evidence after the close of the State's case in chief. In support of this contention, the State relies on *State v. Baldwin*, 2001-NMCA-063, ¶ 30, 130 N.M. 705, 30 P.3d 394, which states, "[i]t is well-settled that a defendant who

presents evidence waives his claim that the evidence at the close of the State's case was insufficient for submission to the jury." (internal quotation marks and citation omitted).

**{11}** The State's argument is based on a misapprehension of the law. The rule stated in *Baldwin* applies to a defendant's argument that the district court erred by denying a motion for directed verdict and submitting the case to the jury. *Id.* However, this rule does not impact a defendant's right to seek review of the sufficiency of the evidence on appeal. *See State v. Hornbeck,* 2008-NMCA-039, ¶ 25, 143 N.M. 562, 178 P.3d 847 (recognizing that "although testifying defendants waive their claims that the evidence is insufficient to submit to the jury, they are afforded an opportunity to present their sufficiency arguments on appeal").

**{12}** The State also relies on *State v. Dutchover*, 1973-NMCA-052, ¶ 13, 85 N.M. 72, 509 P.2d 264, in which we noted that the defendant had not preserved his argument that the evidence was insufficient to establish proximate causation by motion for a directed verdict, and therefore, could not raise the issue for the first time on appeal. Citing *Dutchover*, the State argues that Defendant did not preserve the issue of proximate causation for appeal because the issue was not raised by motion below. We disagree. When *Dutchover* was decided, this was an apparently correct statement of the law. *See State v. Lard*, 1974-NMCA-004, ¶ 6, 86 N.M. 71, 519 P.2d 307. However, the Rules of Criminal Procedure, adopted in 1972, provide that "out of the presence of the jury, the court shall determine the sufficiency of the evidence, whether or not a motion for directed verdict is made." Rule 5-607(K) NMRA; *see also State v. DeBaca*, 1977-NMCA-089, ¶ 24, 90 N.M. 806, 568 P.2d 1252 (recognizing that the Rules of Criminal Procedure were effective July 1, 1972). In *Lard*, we clarified that, because of the adoption of this rule of procedure, "[t]he absence of a motion for a directed verdict at the close of all the evidence [does] not waive the claim that the evidence was insufficient at that point because the [district] court was required to make that determination in the absence of a motion." 1974-NMCA-004, ¶ 6; *see also* Rule 5-607 comm. cmt.

**{13}** Moreover, we have repeatedly recognized since *Dutchover* that a challenge to the sufficiency of the evidence in a criminal case is fundamental and need not be preserved by motion or otherwise in order to secure appellate review. *See State v. Sotelo*, 2013-NMCA-028, ¶ 30, 296 P.3d 1232 ("Defendant need not have preserved this argument because it rests on whether the evidence was sufficient to convict him of kidnapping."); *In Re Gabriel M.*, 2002-NMCA-047, ¶ 9, 132 N.M. 124, 45 P.3d 64 ("Because it concerns the sufficiency of the evidence with regard to one of the elements of the crime, the issue is fundamental and can be raised for the first time on appeal."); *State v. Stein*, 1999-NMCA-065, ¶ 9, 127 N.M. 362, 981 P.2d 295 (discussing that no error is more fundamental than the right not to be convicted when innocent, therefore "the question of sufficiency of the evidence to support a conviction may be raised for the first time on appeal"). We therefore reject the State's argument and proceed to the merits of Defendant's sufficiency challenge.

## A.      Standard of Review

**{14}**    "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Cabezuela*, 2015-NMSC-016, ¶ 14, 350 P.3d 1145 (internal quotation marks and citation omitted). "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Largo*, 2012-NMSC-015, ¶ 30, 278 P.3d 532 (internal quotation marks and citation omitted). Our review employs a two-step process in which we first "view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Cunningham*, 2000-NMSC-009, ¶ 26, 128 N.M. 711, 998 P.2d 176. We then consider "whether the evidence, so viewed, supports the verdict beyond a reasonable doubt." *State v. Garcia*, 2016-NMSC-034, ¶ 24, 384 P.3d 1076. "We do not reweigh the evidence or substitute our judgment for that of the fact finder as long as there is sufficient evidence to support the verdict." *State v. Gipson*, 2009-NMCA-053, ¶ 4, 146 N.M. 202, 207 P.3d 1179. In so evaluating the evidence, we will neither speculate nor "sanction a view that assumes the worst about human nature" because doing so would disregard "an essential message of the presumption of innocence." *State v. Mariano R.*, 1997-NMCA-018, ¶ 7, 123 N.M. 121, 934 P.2d 315. "The jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (alterations, internal quotation marks, and citation, omitted).

**{15}**    The jury was instructed that in order to convict Defendant of involuntary manslaughter, the State was required to prove beyond a reasonable doubt that, on or about December 31, 2015:

1.    [Defendant] punched and kicked Marvin Scarber;

2.    [Defendant] should have known of the danger involved by [his] actions;

3.    [Defendant] acted with a willful disregard for the safety of others;

4.    [Defendant]'s act caused the death of Marvin Scarber; and

5.    [D]efendant did not act in self defense.

*See* UJI 14-231 NMRA (setting out the essential elements of involuntary manslaughter); *see also* NMSA 1978, § 30-2-3(B) (1994) ("Involuntary manslaughter consists of manslaughter committed in the commission of an unlawful act not amounting to felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection.").

**{16}** On appeal, Defendant challenges the sufficiency of the evidence to prove both that his actions caused Mr. Scarber's death and that he should have known of the danger involved in his actions.[1] We address each argument in turn.

## B.    Analysis

**{17}** As a general matter, a conviction for a homicide requires proof that the defendant's actions were both a factual or "but for" cause and a proximate cause of the victim's death. *See State v. Montoya*, 2003-NMSC-004, ¶¶ 11, 22 n.1, 133 N.M. 84, 61 P.3d 793 (discussing the requirement of but for causation); *State v. Landgraf*, 1996-NMCA-024, ¶ 31, 121 N.M. 445, 913 P.2d 252 ("An act must be the proximate cause of a death before a conviction for homicide can be returned based on that act."). Defendant argues that the State only presented evidence that his acts of punching and kicking Mr. Scarber were a "but for" cause of death, but that the State failed to prove that these acts were a proximate cause of death. In support of this contention, Defendant relies on Dr. Cline-Parhamovich's testimony that Mr. Scarber's heart attack occurred because of several causes, including the diseased condition of his heart, stress from the preceding verbal dispute, and the fact that he had been shoveling snow for some time prior to the physical altercation with Defendant. Defendant argues that his acts of punching and kicking Mr. Scarber cannot be separated from these other contributing factors, and therefore, they were not shown to be the proximate cause of death.

**{18}** We begin by observing that "[g]eneral principles of criminal law do not require that a defendant's conduct be the *sole* cause of the crime." *State v. Simpson*, 1993-NMSC-073, ¶ 14, 116 N.M. 768, 867 P.2d 1150. The State was therefore not required to present evidence excluding all possible contributing factors as causes in order to prove that Defendant's acts were a proximate cause of death. "Instead, it is only required that the result be proximately caused by, or the natural and probable consequence of, the accused's conduct." *Id.* (internal quotation marks and citation omitted); *see also Montoya*, 2003-NMSC-004, ¶ 19 ("In cases where death results from multiple causes, an individual may be a legal cause of death even though other significant causes significantly contributed to the cause of death."). Thus, in order to reverse Defendant's conviction for involuntary manslaughter based on insufficient evidence of proximate causation, we would have to determine that there were no facts that would have allowed the jury to find that Defendant's acts of punching and kicking Mr. Scarber were a significant cause of his death. *See* UJI 14-251 NMRA (2000, amended 2017)[2] (defining proximate cause and requiring the jury to find in a homicide case that "[t]he act of the defendant was a significant cause of the death of [the victim]").

---

[1] Defendant relies heavily on out-of-state authority from Delaware in support of his challenges to the sufficiency of the evidence on proximate causation, criminal negligence, and foreseeability. However, we believe that the New Mexico cases cited herein provide sufficiently clear guidance on the issues raised. To the extent Defendant invites this Court to depart from those authorities, we decline to do so.

[2] All references to the UJI 14-251 are to the 2000 version.

**{19}**     In the context of proximate causation, an act is considered a significant cause of the death "if it was an act which, in a natural and continuous chain of events, uninterrupted by an outside event, resulted in the death[.]" *Id.* Relative to this, Dr. Cline-Parhamovich testified that the manner of death was a homicide, an opinion based on her review of the circumstances surrounding Mr. Scarber's heart attack. Specifically, Dr. Cline-Parhamovich testified regarding a causal connection between Mr. Scarber's heart attack and the level of fear that would be inherent in the type of verbal and physical confrontation that occurred, due to the threat that it posed to Mr. Scarber's personal safety. Additionally, in discussing the causal effect of Defendant's actions, Dr. Cline-Parhamovich found it significant that Mr. Scarber collapsed within moments of being struck by Defendant and that he never recovered. Dr. Cline-Parhamovich also considered it relevant that, from the description of events from the witnesses, Mr. Scarber did not appear to show any signs of cardiovascular distress until he was struck by Defendant. The jury also heard testimony from the eyewitnesses that, after Defendant struck him, Mr. Scarber was only able to get up and stagger for a few steps before he fell to the ground again and Mr. Rusk had to initiate CPR. *See Landgraf*, 1996-NMCA-024, ¶ 31 (stating that in the determination of proximate causation common sense is not to be eliminated).

**{20}**     Defendant argues that, because Dr. Cline-Parhamovich testified that the physical battery of Mr. Scarber was itself non-lethal, his acts were too minor to support a finding of proximate causation. *See Simpson*, 1993-NMSC-073, ¶ 13 (recognizing that proximate causation cannot be found where the defendant is only at fault to an insignificant extent). However, "defendants take their victims as they find them." *State v. Romero*, 2005-NMCA-060, ¶ 19, 137 N.M. 456, 112 P.3d 1113. Accordingly, evidence that a victim's pre-existing medical condition renders him or her more vulnerable to an attack that would otherwise not be fatal will not relieve a defendant of criminal liability for a resulting death where the defendant's acts are a significant cause of death. *See Montoya*, 2003-NMSC-004, ¶ 19 (recognizing that "even if the victim is at 'death's door,' a defendant is liable for the victim's death if his act hastens the victim's death").

**{21}**     Viewing the foregoing evidence in the light most favorable to the State, we conclude that a reasonable jury could have determined that Defendant's acts of punching and kicking Mr. Scarber were a significant cause of his death, thus establishing proximate causation. *See Romero*, 2005-NMCA-060, ¶¶ 17, 19-20 (stating that a jury would not entertain a reasonable doubt that the defendant's acts were a significant cause of the victim's death when she died after being beaten by the defendant, even though the victim's drunken state and preexisting liver condition had rendered her more susceptible to the beating that was not so severe as to have caused ordinary death).

**{22}**     Defendant also argues that, while the State presented competent evidence that Defendant's acts were the "but for" cause of death, the evidence was insufficient to meet the State's burden of proof beyond a reasonable doubt. We disagree. At trial, Dr. Cline-Parhamovic opined that, had Mr. Scarber not been involved in the verbal and physical altercation with Defendant, he would not have suffered a heart attack. This

testimony is sufficient to establish but for causation. *See Montoya*, 2003-NMSC-004, ¶ 19 (discussing that "a defendant is a but for cause of death if the death would not have occurred at the time it did and in the manner it did but for [the] defendant's actions").

**{23}** Defendant points to Dr. Cline-Parhamovic's statement during cross-examination that "it is more likely than not that had [Mr. Scarber] not been in this physical and verbal altercation, he would have survived shoveling snow that day." Defendant argues that Dr. Cline-Parhamovic testified to this opinion as a probability and to a "reasonable degree of medical certainty," which only meets the lesser preponderance of the evidence standard. Defendant argues that the State therefore failed to prove "but for" causation beyond a reasonable doubt because it failed to prove that, without Defendant's subsequent punches, Mr. Scarber would not have suffered the heart attack from the snow shoveling. However, the State was not required to present medical testimony that beyond a reasonable doubt Mr. Scarber would not have suffered a heart attack from the snow shoveling alone, because, as discussed, the State was not required to exclude all other possible contributing factors in order to establish that Defendant's acts were a cause of death. "Criminal law only requires that a defendant be 'a' but for cause of death and not 'the' but for cause of death." *Id.*; *see also State v. Munoz*, 1998-NMSC-041, ¶¶ 19-22, 126 N.M. 371, 970 P.2d 143 (rejecting the defendant's argument that in order to be convicted of vehicular manslaughter, his actions must be shown to surpass other contributing factors and recognizing that the issue for the jury was whether or not the defendant was at fault to a significant extent). In cases involving multiple contributing factors, "a defendant is a but for cause of death if the death would not have occurred at the time it did and in the manner it did but for [the] defendant's actions." *Montoya*, 2003-NMSC-004, ¶ 19. Dr. Cline-Parhamovich's opinion testimony that, had it not been for Defendant's actions, Mr. Scarber would not have suffered the heart attack, is sufficient to meet this standard.

**{24}** Defendant next argues that the evidence was insufficient to establish that he should have known of the danger involved in his actions. We understand Defendant to argue specifically that because he could not have known of Mr. Scarber's heart condition, Mr. Scarber's death was not a foreseeable consequence of his conduct and his actions did not meet the standard for criminal negligence. *See* UJI 14-251 (containing as an element of proximate causation that "death was a foreseeable result of the defendant's act[ions]"). For the following reasons, we disagree.

**{25}** In New Mexico, "the State must show at least criminal negligence to convict a criminal defendant of involuntary manslaughter." *State v. Yarborough*, 1996-NMSC-068, ¶ 20, 122 N.M. 596, 930 P.2d 131; *see also State v. Lucero*, 2010-NMSC-011, ¶ 14, 147 N.M. 747, 228 P.3d 1167 ("[I]n the absence of criminal negligence, the defendant cannot be found guilty of involuntary manslaughter."). With respect to involuntary manslaughter, "[c]riminal negligence exists where the defendant act[s] with willful disregard of the rights or safety of others and in a manner which endanger[s] any person or property." *State v. Skippings*, 2011-NMSC-021, ¶ 18, 150 N.M. 216, 258 P.3d 1008 (internal quotation marks and citation omitted). "The showing of criminal negligence required for an involuntary manslaughter jury instruction [also] includes the

concept of recklessness, in which a defendant consciously disregards a substantial and unjustifiable risk that harm will result from his conduct." *State v. Henley*, 2010-NMSC-039, ¶ 16, 148 N.M. 359, 237 P.3d 103 (internal quotation marks and citation omitted).

**{26}** Defendant argues that he could not have known that Mr. Scarber had a significantly diseased heart or that he had been shoveling snow prior to the altercation. Therefore, Defendant argues, he could not have known that the combination of those factors with his non-lethal battery would have killed Mr. Scarber. We first reiterate, as discussed above, that defendants take their victims as they find them. *See Romero*, 2005-NMCA-060, ¶ 19. Additionally, the criminal negligence standard does not require that a defendant have subjective knowledge of all the relevant circumstances or subjective certainty as to the outcome of his actions. Instead, "[c]riminal negligence in the context of involuntary manslaughter requires subjective knowledge by the defendant of the danger or risk to others posed by his or her actions." *Henley*, 2010-NMSC-039, ¶ 17.

**{27}** Here, there was evidence that Defendant intentionally punched an apparently elderly man twice in the face and then kicked him in the chest as he was falling to the ground. We believe the jury could determine from this evidence that Defendant was aware that such actions posed a risk to Mr. Scarber's safety and would likely result in harm. *See Skippings*, 2011-NMSC-021, ¶¶ 16, 19 (holding that "a jury could conclude that [the d]efendant was aware 'of the danger or risk to others posed by his . . . actions' when he caused [the v]ictim to fall on the hard asphalt, a commonly understood peril[,]" and therefore an instruction for involuntary manslaughter was appropriate (omission, internal quotation marks, and citation omitted)). We also believe that this evidence was sufficient to allow a jury to determine that Defendant acted with a willful disregard for Mr. Scarber's safety. *See id.* ¶19 (concluding that where there was evidence that the defendant engaged in a dispute with the victim which escalated into a physical confrontation with the victim in which the defendant's actions caused the victim's fall and subsequent death, there was evidence from which a jury could find that the defendant demonstrated a willful disregard for the victim's safety).

**{28}** We therefore reject Defendant's argument that the State failed to prove that Defendant should have known of the danger involved by his actions and therefore failed to prove that death was a foreseeable result of his actions. *See State v. Duffy*, 1998-NMSC-014, ¶ 28, 126 N.M. 132, 967 P.2d 807 (determining in a felony murder case that where the defendant grabbed a purse from a seventy-six-year-old woman, swung her around, threw her to the ground, and possibly struck her, the jury could reasonably conclude that it was foreseeable that the force required to commit this act was dangerous to human life), *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110.

**{29}** For these reasons, we conclude that the evidence was sufficient to support Defendant's conviction for involuntary manslaughter.

## II.    There Was No Fundamental Error in the Jury Instructions

**{30}**     Defendant next argues that the district court erred in failing to instruct the jury that Defendant had no duty to retreat and on defense of another. *See* UJI 14-5190 NMRA (1986, amended 2018)[3] (no duty to retreat); UJI 14-5172 NMRA ("Justifiable homicide; defense of another"). Defendant did not request either instruction from the district court. Therefore we review for fundamental error. *See State v. Sandoval*, 2011-NMSC-022, ¶ 13, 150 N.M. 224, 258 P.3d 1016 (stating that if error in the jury instructions was not preserved in the district court, the appellate court reviews the instructions for fundamental error rather than reversible error). "The doctrine of fundamental error applies only under exceptional circumstances and only to prevent a miscarriage of justice." *State v. Barber*, 2004-NMSC-019, ¶ 8, 135 N.M. 621, 92 P.3d 633. "For fundamental error to exist, the instruction given must differ materially from the uniform jury instruction, omit essential elements, or be so confusing and incomprehensible that a court cannot be certain that the jury found the essential elements under the facts of the case." *State v. Caldwell*, 2008-NMCA-049, ¶ 24, 143 N.M. 792, 182 P.3d 775 (internal quotation marks and citations omitted). "[J]uror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134.

## A.     "No Retreat" Instruction

**{31}**     Defendant first argues that the district court erred in not giving the jury UJI 14-5190, the "stand-your-ground" or "no-retreat" instruction, which states: "A person who is threatened with an attack need not retreat. In the exercise of his right of self-defense, he may stand his ground and defend himself." *Id.* "When reviewing jury instruction issues for fundamental error, we first apply the standard for reversible error by determining if a reasonable juror would have been 'confused or misdirected' by the jury instructions that were given." *State v. Anderson*, 2016-NMCA-007, ¶ 9, 364 P.3d 306 (citing *Barber*, 2004-NMSC-019, ¶ 19). "If we determine that a reasonable juror would have been confused or misdirected by the instructions given, our fundamental error analysis requires us to then review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the defendant's conviction was the result of a plain miscarriage of justice." *Id.* (alteration, internal quotation marks, and citation omitted).

**{32}**     Defendant argues that the absence of the no-retreat instruction resulted in juror confusion and misdirection because self-defense "was the main theory of the defense[] case[,]" and the no-retreat issue was touched upon during trial. Defendant relies on our opinion in *Anderson*, in which we determined that the district court committed fundamental error by failing to give a no-retreat instruction to the jury. In *Anderson*, the defendant requested a self-defense instruction and the no-retreat instruction, and the district court agreed that both instructions should be given. *Id.* ¶ 5. However, due to an oversight by both the district court and counsel, the no-retreat instruction was not

---

[3] All references to the UJI 14-5190 are to the 1986 version.

submitted to the jury. *Id.* ¶ 6. During deliberations, the jury asked if New Mexico had a "stand-your-ground" law, but ultimately withdrew the question. *Id.*

**{33}** We determined that it was reversible error to omit the no-retreat instruction in *Anderson* because the jury's understanding of all the elements governing self-defense was deficient in the absence of the instruction. *Id.* ¶¶ 10-12. We recognized that "[w]here the evidentiary basis for the instruction has been laid, UJI 14-5190 informs jurors of what is reasonable" within the meaning of the self-defense instruction. *Anderson*, 2016-NMCA-007, ¶ 14; *see also* UJI 14-5171 NMRA (listing as an element of self-defense that "[a] reasonable person in the same circumstances as the defendant would have acted as the defendant did"). Because in *Anderson*, the "[d]efendant's self-defense theory rested on the argument that, under the circumstances, he had no duty to retreat from the confrontation with [the victim]," we determined that the no-retreat instruction was critical to understanding the reasonableness element of the general self-defense instruction. 2016-NMCA-007, ¶ 14; *see also State v. Candelaria*, 2019-NMSC-004, ¶ 35, 434 P.3d 297 (discussing that, where the evidentiary basis is laid, a no-retreat instruction alters what "reasonable" means in the self-defense instruction).

**{34}** In this case, the evidentiary basis for the no-retreat instruction was not laid because the subject of no-retreat was not put at issue by the testimony and evidence at trial. *See State v. Lucero*, 1998-NMSC-044, ¶ 5, 126 N.M. 552, 972 P.2d 1143 (recognizing "that a defendant is entitled to have his [or her] theory of the case submitted to the jury under proper instructions where the evidence supports it"). Defendant argues that the prosecutor put no-retreat at issue because she suggested that Defendant had a duty to retreat when she questioned him about not leaving while Mr. Scarber and his wife were engaged in an argument. Defendant argues that the no-retreat instruction was therefore critical to his self-defense theory because without the instruction, the jury was left with the impression that Defendant had to retreat in order to have acted reasonably. We disagree. Our review of the portion of the recording of the trial cited by Defendant contains the following exchange:

| PROSECUTOR: | And by the time you come back outside, your wife was yelling at him and there's yelling going back and forth, correct? |
|---|---|
| DEFENDANT: | Everybody was yelling, yes. |
| PROSECUTOR: | But your wife was involved in it? |
| DEFENDANT: | Yeah, yeah. |
| PROSECUTOR: | And at no time you saw him threaten your wife, right? |
| DEFENDANT: | No I never saw him threaten my wife. They were just arguing and [inaudible] words and everything was being said. |
| PROSECUTOR: | And so instead of at that time just leaving, you allowed them to continue and to engage in the argument and just stood there, correct? |
| DEFENDANT: | I just stood there. |

PROSECUTOR:     And at no point said, "Why don't we just get out of here?"

DEFENDANT:      Um, no.

**{35}** The prosecutor's questions were not directed at the period of time when Defendant claimed he was threatened by Mr. Scarber with the shovel. Rather they went to the preceding confrontation between Mr. Scarber and Defendant's wife, during which time there was no testimony regarding any threat to Defendant. We therefore disagree that the State invited the jury to conclude that Defendant had a duty to retreat from a threat to his safety. *See Candelaria*, 2019-NMSC-004, ¶ 37 (rejecting the defendant's argument that the State put no-retreat at issue where a full review of the prosecutor's statement indicated that it was not a comment on the defendant's duty to retreat, but rather, on the "reasonableness of [the d]efendant's act of shooting at the vehicle").

**{36}** We also disagree with Defendant that he put no-retreat at issue when, in response to counsel's question if he could have done something other than punch Mr. Scarber, he replied "you could ask me why . . . I didn't walk off? I didn't want to turn my back. I don't know him." In the context of the surrounding questions and answers, Defendant was referring to Mr. Scarber having threatened to do some unspecified act to Defendant, which Defendant believed he would do, so Defendant could not safely turn to walk away from Mr. Scarber. In explaining why he punched Mr. Scarber, Defendant testified, "[i]f I would have believed I could have just turned my back and turned around and nothing would have happened, I would have did that." Defendant's theory was essentially that he tried everything he could to avoid the situation with Mr. Scarber, but that given the circumstances and Mr. Scarber's conduct, he had no other choice but to punch Mr. Scarber in order to defend himself. Defendant's defense was thus that he had no ability or opportunity to safely retreat from Mr. Scarber, not that he had a right to stand his ground.

**{37}** Therefore, unlike in *Anderson*, Defendant's theory of self-defense did not rest on an argument that he had no duty to retreat from the confrontation with Mr. Scarber. *Cf. Anderson*, 2016-NMCA-007, ¶ 14 (discussing that because the defendant's self-defense theory rested on the argument that, under the circumstances, he had no duty to retreat from the confrontation, the jury instructions failed to fully inform the jury of the law of self-defense relevant to the case). Consequently, a consideration of the no-retreat instruction was not critical to the jury's understanding of the term "reasonable" in the context of the self-defense instruction. Therefore, we do not believe that a reasonable juror would have been confused or misdirected by the omission of the no-retreat instruction when considering Defendant's claim of self-defense. *See Candelaria*, 2019-NMSC-004, ¶ 35 (concluding that a reasonable juror would not have been confused or misdirected by the failure to give a no-retreat instruction where the jury was properly instructed on self-defense and defense of another, and the evidentiary basis for the instruction was not laid).

**{38}** We therefore conclude that it was not reversible error for the district court to omit the no-retreat instruction, and therefore, not fundamental error. *See id.* ¶¶ 35-37

(determining that there was no error in the district court's failure to submit a no-retreat instruction where the evidentiary basis for the instruction was not laid and the defendant did not argue that he had no duty to retreat); *State v. Adamo*, 2018-NMCA-013, ¶ 27, 409 P.3d 1002 ("Since there was no reversible error, it follows that there was no fundamental error in the instructions.").

## B.      Defendant Was Not Entitled to an Instruction on Defense of Another

**{39}**    We also reject Defendant's argument that the district court committed fundamental error by failing to give an instruction on defense of another. The failure to instruct the jury on a defendant's theory of the case is reversible only if the evidence at trial supported giving the instruction. *See State v. Baxendale*, 2016-NMCA-048, ¶ 21, 370 P.3d 813.

**{40}**    We analyze the need to give the defense of another instruction in the same manner as we would a request for a self-defense instruction. *See Sandoval*, 2011-NMSC-022, ¶ 16. To warrant an instruction on defense of another, there would have to be evidence from which the jury could determine that: (1) there was an appearance of immediate danger of death or great bodily harm to Defendant's wife as a result of Mr. Scarber's actions; (2) Defendant believed that Defendant's wife was in immediate danger of death or great bodily harm from Mr. Scarber and punched and kicked Mr. Scarber to prevent that death or great bodily harm; and (3) the apparent danger to Defendant's wife would have caused a reasonable person in the same circumstances to act as Defendant did. *See* UJI 14-5172 (setting out the elements of justifiable homicide in defense of another); *Sandoval*, 2011-NMSC-022, ¶ 17 (outlining when a defense of another jury instruction is properly issued).

**{41}**    As evidence that he acted in defense of his wife, Defendant points to his testimony that he was concerned that Mr. Scarber might hit his wife with the shovel. However, Defendant's statement that he did not want his wife to get hit by the shovel was directed at explaining why he went out of the Allsups and stood by his wife and Mr. Scarber while they were arguing; it was not asserted to explain why he punched Mr. Scarber. Significantly, as the exchange between Defendant and the prosecutor quoted above demonstrates, Defendant testified that at no time did he see Mr. Scarber threaten his wife. Defendant also testified that he punched Mr. Scarber because Mr. Scarber was hitting and threatening him with the shovel, not because he was protecting his wife. Therefore, even when viewed in the light most favorable to Defendant, the evidence was insufficient to support an instruction for defense of another because it does not support a finding that there was any appearance of imminent death or great bodily harm to Defendant's wife, nor does it support a finding that Defendant acted based on a perceived fear of death or great bodily harm to his wife. Accordingly, the district court did not err by not instructing the jury on defense of another. *See State v. Rudolfo*, 2008-NMSC-036, ¶ 17, 144 N.M. 305, 187 P.3d 170 ("A defendant is not entitled to a [defense of another] instruction unless it is justified by sufficient evidence on every element of [the defense]."); *see also State v. Jernigan*, 2006-NMSC-003, ¶ 6, 139 N.M. 1, 127 P.3d 537 (concluding that where the evidence did not support a view that the

defendant believed that his girlfriend was in imminent danger of death or great bodily harm, the defendant was not entitled to a defense of another instruction). We therefore reject Defendant's fundamental error argument. *See Adamo*, 2018-NMCA-013, ¶ 27 (stating that where there was no error in the jury instructions, there was no fundamental error).

## C. No Cumulative Error

**{42}** Finally, we reject Defendant's argument that the cumulative effect of errors in the instructions to the jury deprived him of a fair trial. "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial." *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61. Having determined that there was no error in the jury instructions, there can be no cumulative error requiring reversal. *See State v. Casillas*, 2009-NMCA-034, ¶ 51, 145 N.M. 783, 205 P.3d 830 ("Because there was no error, . . . there was no cumulative error.").

## CONCLUSION

**{43}** For these reasons, we affirm Defendant's conviction for involuntary manslaughter.

**{44}  IT IS SO ORDERED.**

**ZACHARY A. IVES, Judge**

**J. MILES HANISEE, Chief Judge**

**KRISTINA BOGARDUS, Judge**